**In re: the LADY H COAL COMPANY, INC., Consolidated Sewell, Inc., Sewell Coal Company, Leivasy Mining Corporation, Eastwood Construction, Inc., Debtors in Possession.**

Misc. No. 2:96–MC–0033.

United States District Court,
S.D. West Virginia,
Charleston Division.

April 23, 1996.

596

John A. Rollins, Charleston, WV, for Debtors.

Susan Cannon–Ryan, Charleston, WV, for UMWA 1992 Benefit Plan.

Steven Thompson, for Chicopee Coal.

Marilyn Baker, Washington, DC, for UMWA Health and Retirement Fund.

Christopher Clarke, Washington, DC, for UMWA Health and Retirement Fund.

Thomas Vanderford, Charleston, WV, for CIT.

Michael Ramada, for Genesis Equipment.

Arthur M. Standish, Charleston, WV, and Mike Funk, for United Coal.

Tom Gilpin, Ashland, MO, for Van–American Insurance, New Gauley Coal and Clarendon Insurance Co.

Richard Stephenson, Charleston, WV, for WV Workers' Compensation, Unemployment.

Jack Alsop, Webster Springs, WV, for Estate of Mr. Post.

William F. Dobbs, Jr., counsel for Westmoreland Coal, Caterpillar and Westvaco.

James McHugh, Charleston, WV, for Simmons–Rand.

Michael T. Chaney, Charleston, WV, for Ford Motor Credit.

Michael Niggemyer, and Randolph McGraw, for UMWA District 17.

Molly Kettler Wade, Charleston, WV, for UMWA Employees.

Robert Weinberger, Charleston, WV, Assistant U.S. Trustee.

William E. Hamb, Charleston, WV, for Georgia Pacific.

Helen Morris, Huntington, WV, Chapter 7 Trustee for M & H Coal Company.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

On March 13, 1996 the Court referred this matter to the Honorable Ronald G. Pearson, United States Bankruptcy Judge, for proposed findings of fact and conclusions of law pursuant to 28 U.S.C. § 157. Judge Pearson was designated to consider the pleadings and evidence surrounding the objections of the 1992 Benefit Plan to the Debtors' motion for approval of auction and sale procedures, for authority to sell real and personal property free and clear of liens and encumbrances and for assignment of executory contracts and leases. The UMWA did not file timely written objections to the motion but did object at a hearing before Judge Pearson. Since the issues contained in the objections of both the 1992 Plan and the UMWA are closely related, Judge Pearson appropriately considered both objections in formulating his proposed disposition to this Court.

The proposed disposition was filed March 29, 1996. This Court then entered a briefing schedule for objections. The Court has considered the proposed disposition and the briefing. The case is ripe.

### I. DISCUSSION

Following the submission of Judge Pearson's proposed disposition, the Honorable Elizabeth V. Hallanan, United States District Judge for the District, entered a Memorandum Opinion and Order on April 16, 1996, which now is binding district precedent and which resolves the objections filed by the 1992 Plan in this case. *See UMWA 1992 Benefit Plan And Its Trustees v. Leckie Smokeless Coal Co.,* 201 B.R. 163 (S.D.W.Va. 1996).

In *Leckie,* the Court addressed the "issue of the effect of a free and clear order under 11 U.S.C. § 363 on successor liability under the Coal Industry Retiree Health Benefit Act of 1992 ('the Coal Act'), 26 U.S.C. § 9701, *et seq.*" Op. at 165. In sum, Judge Hallanan held (1) successor liability of a buyer under the Coal Act could not be eliminated simply

by virtue of a § 363 sale; (2) only a buyer who is either a related person or "successor in interest" could be required to assume a debtor's Coal Act obligations in a § 363 sale; (3) under an Internal Revenue Code definition of successor in interest, "purchasers of assets in bankruptcy cannot be 'successors in interest' because, as that term is defined in the Code, they do no[t] inherit the tax attributes of their predecessors[,]" op. at 171; (4) the obligations due the Funds constituted an "interest in property" under § 363(f) and a "claim" under 11 U.S.C. § 101(5); (5) the debtors' assets could be sold under § 363(f) free and clear of the obligations due the Funds; (6) the debtors did not seek a discharge of debts through the proposed sale, and thus 11 U.S.C. § 524(e) was inapplicable; and (7) the proposed transaction was not a "sham transaction" within the meaning of § 9722 of the Coal Act.

The ruling in *Leckie* disposes of the objections by the 1992 Plan in this case because, *inter alia*, the apparent buyer at the proposed sale, as a matter of law, cannot be considered a related person or "successor in interest" to Debtors under the Coal Act. Further, as found by the Bankruptcy Judge, there is absolutely no indication that the free and clear portion of the proposed sale is either a "sham transaction" under § 9722 of the Coal Act or not undertaken in good faith pursuant to § 363(f) of the Bankruptcy Code.[1] Rather, the "sale has not been proposed for any reason other than to liquidate the property of these Debtors in a way to obtain the maximum return for all creditors, including the objecting creditors." Proposed Disp. at 6. Accordingly, the objections of the 1992 Plan are **OVERRULED**.[2]

■■■ The *Leckie* decision does not control the objections filed by the UMWA. After careful consideration of those objections, however, the Court concludes they are not meritorious. As amply demonstrated in Judge Pearson's proposed disposition, the

breadth of § 363(f) and § 101(5)(B) is sufficient to block the imposition on the buyer of any liability for Debtors' obligations under the collective bargaining agreement. Accordingly, the Court **OVERRULES** the objections of the UMWA and **ADOPTS** and **INCORPORATES** Judge Pearson's proposed disposition relating to the buyer's and Debtors' obligations to the UMWA under § 363(f). As noted, however, Debtors may be subjected to damages later if they should be determined to have breached the collective bargaining agreement.

## II. CONCLUSION

As set forth in the foregoing discussion, the Court **OVERRULES** the objections of the 1992 Plan and the UMWA and **ADOPTS** the proposed findings of fact and conclusions of law as they relate to the UMWA's objections. This case is **REFERRED** to the United States Bankruptcy Court with full authority to proceed to sale.

The Clerk is directed to close this miscellaneous proceeding and to send a copy of this Memorandum Opinion and Order to counsel of record and Judge Pearson.

**RECOMMENDATION AND MEMORANDUM TO DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA ON OBJECTIONS OF UMWA 1992 BENEFIT PLAN AND UMWA INTERNATIONAL TO THE MOTION OF DEBTORS FOR AUTHORITY TO SELL REAL AND PERSONAL PROPERTY FREE AND CLEAR OF LIENS AND ENCUMBRANCES AND FOR ASSIGNMENT OF EXECUTORY CONTRACTS AND LEASES**

RONALD G. PEARSON, Bankruptcy Judge.

### INTRODUCTION

The Court has under consideration certain objections to the Motion of Debtors for Ap-

---

1. The Court leaves to the Bankruptcy Judge the question of whether the consideration for, and other components of, the proposed sale independently satisfy the good faith and fair and reasonable value requirements of § 363(f).

2. The very thorough *Leckie* opinion and Judge Pearson's well-reasoned proposed disposition reach the same result via only slightly dissimilar

analyses. The Court believes the better approach under the principle of *stare decisis*, however, is to follow the recent *Leckie* decision. Should Judge Hallanan revisit her Order, or should that Order meet with less than full agreement from the Court of Appeals, the Court would adopt in the alternative Judge Pearson's fine analysis.

proval of Auction and Sale Procedures, for Authority to Sell Real and Personal Property Free and Clear of Liens and Encumbrances and for Assignment of Executory Contracts and Leases (the "Debtors' Motion") as filed on March 7, 1996. A hearing was conducted on the Debtors' Motion and respective objections on March 13, 1996. The parties and counsel appearing at the hearing are noted in Exhibit A. The Court granted the Debtors' Motion subject to the District Court's review of recommended findings of fact and conclusions of law as it relates to the objections of (1) Michael H. Holland, Marty D. Hudson, Thomas F. Connors, and Robert T. Wallace, Trustees of the UMWA 1992 Benefit Plan (the "1992 Plan") and (2) United Mine Workers of America, International ("UMWA"). No other creditor or party-in-interest has any substantive objection to the Debtors' Motion. The Debtors' Motion as presented proposes a piecemeal liquidation of equipment by auction, but requires this Court to conduct a hearing subsequent to the auction to confirm the sale of real estate assets by determining if the Debtors have satisfied the requirements of 11 U.S.C. § 363. The Court must find that the auction was conducted in good faith and any bids represent fair and reasonable value to the bankruptcy estates.

The 1992 Plan filed a written objection to the Debtors' Motion and moved to withdraw reference to the District Court for the Southern District of West Virginia. The District Court by Order entered March 13, 1996 directed this Court to submit proposed findings of fact and conclusions of law as it relates to the objection for disposition of issues regarding the Coal Act as they interact with the Bankruptcy Code or to indicate specifically why the Coal Act is not implicated by the Debtors' proposed grant of relief. The 1992 Plan asserts that a bankruptcy auction cannot be free and clear of obligations under the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), 26 U.S.C. §§ 9701 et seq. The UMWA filed no timely written objection but announced its objection at the hearing to a sale free and clear of the National Bituminous Coal Wage Agreement of 1993 ("NBCWA"). Since the issues of the 1992 Plan and UMWA are closely related, the Court makes recommended findings of fact and conclusions of law to the District Court as to both objections, which raise successor liability issues. A decision on these objections of the 1992 Plan and UMWA is needed to clarify the obligations of a purchaser.

The 1992 Plan and the UMWA have the right as creditors in these cases to sponsor, purchase, joint venture, assist or finance purchasers willing to assume all or a portion of the premiums due under the Coal Act or the NBCWA. Given these rights, it is difficult to understand how counsel for the 1992 Plan or UMWA employees can assert that they are protecting the respective interests of their clients by raising these objections. Without the auction as proposed by the Debtors, administrative claims of 1992 Plan and UMWA employees will likely go unpaid and it is uncertain whether the 220 employees will work these mines again. The evidence reflects that (1) the operations of the Debtors have been shut down since mid-February; (2) both union and non-union employees were not paid for the last several weeks of work; (3) a super-priority lien has been found necessary to induce a secured creditor to advance funds to maintain power to preserve assets for the auction and to prevent the irreparable harm of flooding to the mines; and (4) secured equipment creditors are bringing equipment to the surface at their own expense in order sell collateral through the auction or independently.

The 1992 Plan and UMWA have stated on the record that their objections shall not be asserted in the event that the auction results in a piecemeal sale of the assets or if a buyer of all assets assumes the liabilities under the Coal Act and the NBCWA. Therefore, the objections of the 1992 Plan and UMWA shall only continue to be asserted if a buyer of all assets is not willing to assume the respective obligations of the 1992 Plan and UMWA. By this request, these creditors are asking this Court to discourage bidders not willing to assume these creditors' obligations. This Court cannot rule that any buyer, who purchases substantially all of the Debtors' assets free and clear of interests, be responsible for unpaid claims due under the Coal Act and employ all former employees under the

NBCWA. There is simply no provision in state or federal law that imposes the conditions the Funds and the UMWA seek. For these reasons and as set forth below, this Court recommends that the objections of the 1992 Plan and UMWA be overruled.

## PROCEDURAL HISTORY

This Court entered an Order on February 28, 1996 in the above-referenced bankruptcy cases entitled Memorandum Opinion and Order Denying the Debtors' Motion to Reject UMWA Agreement, Granting the Debtors' Motion to Sell Substantially all of its Assets, Subject to the Right of the UMWA Employees to File Claims for Post–Petition Breach of Contract, Granting the Debtors' Request that Such Sale be Free and Clear of Any Interest, With Claims and Interests Attaching to The Proceeds of Sale, and Denying the Debtors' Request for Injunctive Relief, which dealt with similar issues as presented in the objections being considered in this order and memorandum, specifically the ability of Debtors to sell assets free and clear of any interests. Such Order was entered upon the motion of the Debtors to sell substantially all assets to A.T. Massey & Company ("A.T. Massey"). Upon A.T. Massey subsequently withdrawing its offer to purchase the Debtors' assets, certain parties, including the Debtors and UMWA Funds, motioned to vacate and/or moot the findings in such Order, although this Court has not acted upon such motions.

As announced at the March 13, 1996 hearing and as incorporated in separate orders, the Court accepted the modifications and clarifications to the Debtors' Motion and the stipulation between the Debtors and United Coal Company ("United"), which provided in part the resolution of United's objection to the Debtors' Motion and financing for a short period of time to continue electric power to the mines. The Court authorized a sale to be advertised pending submission of this Memorandum to the District Court. Exhibit B includes the Court's findings from the March 13, 1996 hearing on the Debtors' Motion. Finally, by Interim Order entered March 27, 1996, this Court set forth a schedule for the auction process of the Debtors.

Accordingly, the auction is to take place on April 17, 18 and 19, 1996, with any advance bids which contemplate the purchase of multiple items of Real Estate, as defined in such Order, due on April 5, 1996. The Court shall conduct a hearing confirming the sale of Real Estate items on April 23, 1996 or as soon as the District Court rules upon the objections subject to this Memorandum.

## RECOMMENDED FINDINGS OF FACT

The Debtors in this procedurally consolidated case include Consolidated Sewell, Inc. ("Consolidated"), parent corporation of Lady H Coal Company ("Lady H") and Sewell Coal Co. ("Sewell"), and Lady H's two subsidiaries, Leivasy Mining Corporation ("Leivasy") and Eastwood Construction, Inc. ("Eastwood"). The estate of William Post, Clyde See and John Leaberry each own one-third (1/3rd) of the parent corporation, Consolidated. Petitions for relief under Chapter 11 of the Bankruptcy Code were filed on:

| | |
|---|---|
| Lady H: | July 20, 1994 |
| Eastwood: | November 7, 1994 |
| Leivasy: | December 2, 1994 |
| Consolidated and Sewell: | December 22, 1994 |

The Debtors were involved in coal mining operations primarily in Nicholas, County, West Virginia, and once employed approximately 220 employees, including approximately 180 employees covered by the NBCWA.

According to the monthly operating reports filed with the Court, the Debtors' post-petition losses are substantial, with $8.6 million in losses for the fiscal year ended June 30, 1995 on sales of $21.8 million and $2.1 million in losses for the four months ended October 31, 1995 on sales of $7.7 million. The financial resources of the Debtors were depleted and operations were discontinued in mid-February. Upon the shutdown of operations, employees were unpaid for the final four weeks of work and little or no cash was left to preserve assets. The mines were and continue to be in danger of having power terminated and flooding. The Debtors have lost the ability to reorganize as an operating entity. The only option available to these Chapter 11 bankruptcy estates is a liquidation of assets, either collectively or piecemeal.

The prompt auction of substantially all the Debtors' assets, either collectively or piecemeal, should bring substantially more value for creditors in this case, including secured, landlord, and employee creditors, than a liquidation under a Chapter 7, since the Debtors are maintaining power to the mines in order to preserve the value of the working mines.[1] If power to the mines is cut off and mines flood or other damage occurs, the Court believes the value of the Debtors' property would greatly diminish. The Court finds that this sale has not been proposed for any reason other than to liquidate the property of these Debtors in a way to obtain the maximum return for all creditors, including the objecting creditors.

## RECOMMENDED CONCLUSIONS OF LAW

As this Court found that time was of the essence, the Debtors' plan of an auction sale free and clear of interests was approved during a hearing conducted March 13, 1996, subject to the resolution of the objections of the 1992 Plan and UMWA by the District Court. Although the factual situation presented in this instance is different from the previously proposed private sale to A.T. Massey[2], the 1992 Plan and UMWA have again objected to a sale free and clear of interests as authorized by § 363(f) of the Bankruptcy Code. The 1992 Plan and UMWA essentially seek a protective order requiring a purchaser to assume their claims and such would chill bids at a public auction of the Debtors' property. No law permits this Court to impose such a penalty on all creditors and parties-in-interests in these cases. For the reasons set forth below, the objections of the 1992 Plan and the UMWA should be overruled.

## A. Claims as Defined by the Bankruptcy Code

In order to determine what interests may be sold free and clear of liens and other interests in a court-approved public auction, a court must first determine what claims are included in these bankruptcy proceedings.

The 1992 Plan believes that Coal Act obligations which have not accrued or been assessed against the Debtors are not affected by the bankruptcy, or in other words are not claims of these bankruptcy estates, while the UMWA asserts that its successorship rights pursuant to the collective bargaining agreement, entered into by these Debtors prepetition, is not a right which may be reduced to judgment if the Debtors violate such provision. The Bankruptcy Code in § 101 provides a comprehensive definition of claim, which states:

(5) "claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

One of the leading cases discussing the broad scope of the definition of claim is *United States v. LTV Corporation (In re Chateaugay Corporation)*, 944 F.2d 997 (2d Cir. 1991). An issue presented before the Second Circuit was whether unincurred Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") response costs for pre-petition releases was a claim within the bankruptcy proceeding. The Second Circuit in quoting the legislative history of this Bankruptcy Code section stated "[b]y this broadest possible definition ... the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." *Id.* at 1003, *citing,* H.R.Rep. No. 595, 95th Cong., 2d Sess. 309 (1978), reprinted in 1978 Code Cong. Admin. News 5787, 5963, 6266. Also, *see Johnson v. Home State Bank,* 501 U.S. 78, 83, 111 S.Ct. 2150, 2153–

---

**1.** Funds to maintain power to the mines have been provided from the secured equipment creditors.

**2.** See Order entered February 28, 1996.

54, 115 L.Ed.2d 66 (1991); *Pennsylvania Dep't of Public Welfare v. Davenport*, 495 U.S. 552, 558, 563–564, 110 S.Ct. 2126, 2130–2131, 2133–2134, 109 L.Ed.2d 588 (1990); *Ohio v. Kovacs*, 469 U.S. 274, 279, 105 S.Ct. 705, 707–708, 83 L.Ed.2d 649 (1985). The court was not persuaded by the argument of the Environmental Protection Agency ("EPA") that the Bankruptcy Code should be narrowly read in light of the environmental interests of Congress in enacting CERCLA, stating:

If the [Bankruptcy] Code, fairly construed, creates limits on the extent of environmental cleanup efforts, the remedy is for Congress to make exceptions to the Code to achieve other objectives that Congress chooses to reach, rather than for courts to restrict the meaning of across-the board legislation like a bankruptcy law in order to promote objectives evident in more focused statutes.... Yet the evident intent of Congress to apply broadly the definition of "claim" counsels against the narrow reading urged by EPA, especially in the context of obligations arising out of public regulation. Though there does not yet exist between EPA and LTV the degree of relationship between claimant and debtor typical of an existing though unmatured contract claim, the relationship is far closer than that existing between tort claimants totally unaware of injury and a tort-feasor. EPA is acutely aware of LTV and vice versa. The relationship between environmental regulating agencies and those subject to regulation provides sufficient 'contemplation' of contingencies to bring most ultimately maturing payment obligations based on pre-petition conduct within the definition of "claims".

*Id.* at 1002 and 1005.

 The conflict between two bodies of federal law is not limited to the case above, where the broad interpretation of a claim under the Bankruptcy Code prevailed over national environmental legislation. As stated in *Sheet Metal Workers' Int'l Ass'n v. Mile Hi Metal Systems, Inc. (In re Mile Hi Metal Systems, Inc.)*, 899 F.2d 887 (10th Cir.1990):

The Bankruptcy Code cuts across a broad spectrum of other areas of law in order to allow debtors the opportunity to reorganize.... We recognize the strong national policies which protect workers from unfair labor practices and ensure the enforceability of collective bargaining agreements.... But Chapter 11 of the Bankruptcy Code reflects an equally strong public policy "to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." *NLRB v. Bildisco*, 465 U.S. at 528, 104 S.Ct. at 1197.[3]

*Id.* at 891.

Bankruptcy courts are commonly in a position where they must balance and decide other areas of federal law. *See e.g. In re Lombardo Fruit & Produce*, 106 B.R. 593 (Bankr.E.D.Mo.1989) (applying the Perishable Agricultural Commodities Act); *In re Brown*, 106 B.R. 852 (Bankr.E.D.Pa.1989) (interpreting the Truth in Lending Act).

 In these cases, the 1992 Plan asserts that the District Court is required to resolve the conflict between the Bankruptcy Code and the Coal Act to determine whether the claims of the 1992 Plan encompass the entirety of the liability as it relates to these retirees which may be sold free and clear at a public auction or whether the Coal Act allows the 1992 Plan to later assert premiums which these bankruptcy estates are responsible for against a successor, as such term is used and undefined in the Coal Act. There is no dispute that the Coal Act was enacted by Congress in 1992 to address the health care crisis of retired UMWA coal miners and their dependents, which is not unlike the broad and sweeping purposes of CERCLA in addressing national hazardous environmental issues.

 Pursuant to the 1992 Benefit Plan, as contained in the Coal Act, these Debtors, as signatory operators under the 1988 National Bituminous Coal Wage Agreement,

---

**3.** Based upon this Supreme Court opinion, which allowed the unilateral rejection of a collective bargaining agreement, Congress subsequently enacted 11 U.S.C. § 1113; however, the quoted passage above states an important purpose of bankruptcy law and an important issue to the approximate 220 workers who can be provided jobs at the Leivasy mines.

have a responsibility to provide health care coverage for retirees, and if the Debtors fail to provide such benefits, the 1992 Plan shall provide the benefits. *See* 26 U.S.C. § 9711 and § 9712(b)(2). The 1992 Benefit Plan is funded in part by monthly per beneficiary premiums from employers, such as the Debtors. *See* 26 U.S.C. § 9712(d)(1)(B). As the 1992 Plan points out in its Memorandum in Support of UMWA 1992 Benefit Plan's Motion to Withdraw the Reference Pursuant to 28 U.S.C. § 157(d), as filed with the District Court, the Debtors continue to be liable for such premiums whether or not the Debtors remain in business. As previously stated, these Debtors discontinued operations in mid-February of 1996 and consequently remain liable for any premiums whether such premiums have accrued or not. The 1992 Plan relied upon the decision in *Holland v. Double G Coal Co.*, 898 F.Supp. 351 (S.D.W.Va.1995) for the proposition that even if a signatory operator ceased business it remained liable for such obligations.

 In applying this holding to the present facts, the Debtors remain liable for the entire amount of premiums due to the 1992 Plan even though such premiums have not accrued or are not fixed in amount. Therefore, the 1992 Plan holds a claim, which is unliquidated and contingent in part, for the amount of premiums to be assessed for the approximate 150 retirees of the Debtors. This Court finds no conflict with the Bankruptcy Code as the broad definition of claim pursuant to 11 U.S.C. § 101(5) encompasses the entire liability of these Debtors under the 1992 Plan, whether or not such premiums have been assessed against the Debtors. Further, this Court pursuant to 11 U.S.C. § 502(c) is empowered to estimate such contingent claims as to not unduly delay the administration of the estate.

If Congress wished to exclude Coal Act liabilities from the reach of bankruptcy law, it could have done so by providing exceptions to a sale free and clear of any interest or limiting the definition of claim in the Bankruptcy Code or by providing express language in the Coal Act that liabilities remain unaffected by operation of the Bankruptcy Code. However, Congress has not provided any express statutory language which would limit the definition of a claim under the Bankruptcy Code to preclude the past and future liabilities of these Debtors as created by the Coal Act. The Coal Act became effective prior to these Debtors seeking bankruptcy protection and upon the effective date of the 1992 Plan, these Debtors became liable for health benefits for the retirees and their dependents covered by such plan.

This finding is not contrary to the decisions in *Adventure Resources, Inc. v. Holland (In re Adventure Resources, Inc.)*, 193 B.R. 787 (S.D.W.VA.1996) or *LTV Corporation v. Shalala (In re Chateaugay Corporation)*, 53 F.3d 478 (2d Cir.1995). In the *Adventure* opinion, the issue before the District Court was whether all or a portion of the accrued premiums under the Coal Act were entitled to an administrative expense priority and not whether their claim also consisted of contingent and unmatured obligations. Likewise, in the *LTV* case, the Second Circuit found that since the Coal Act was enacted approximately six years prior to the debtor filing for bankruptcy protection, such liability could not be considered a claim, either contingent or unmatured, within the bankruptcy proceeding, as there was "no legal relationship defined at the time of the petition." *Id.* at 497. In these cases, since the Coal Act became effective on February 1, 1993, long before any of these Debtors filed for bankruptcy relief, it is clear that the obligation arose prior to the bankruptcy proceeding and is therefore a claim within these proceedings, whether or not such claim is matured or unmatured.

 The UMWA asserts that its rights as created by Article I of the NBCWA are not claims within this bankruptcy proceeding and the UMWA essentially seeks an order that limits the sale of real estate assets to only those who will assume the Debtors' labor agreement.[4] However, this Court be-

---

4. Article I of the NBCWA states in part:
In consideration of the Union's execution of this Agreement, each Employer promises that its operations covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first se-

lieves that such labor contract rights are exactly the sort of claim encompassed by 11 U.S.C. 101(5)(B) as quoted above. The fundamental argument advanced by the UMWA is that the contractual rights pursuant to the NBCWA require assets to be sold to a purchaser who will assume the NBCWA. If a sale in this instance results in a breach of the collective bargaining agreement, specifically Article I of the NBCWA, the UMWA employees may assert damages for breach of such provision.[5] However, if a breach does result from the Debtors' proposed auction, the same does not prevent a sale free and clear of the NBCWA as the rights of the UMWA are claims within these bankruptcy proceedings. As found in the *LTV* case, the UMWA cannot seek the equitable remedy of enjoining the sale since if a breach of the NBCWA occurs it may be satisfied by monetary damages asserted against the Debtors.

For the reasons set forth above, the Court finds that the 1992 Plan and UMWA hold claims within these bankruptcy proceedings, whether or not such liabilities are unassessed, unmatured, contingent or an equitable remedy that may be satisfied by damages. As it relates to the 1992 Plan, such claims against these Debtors would include all accrued and unaccrued premiums for the 150 retirees the Debtors are responsible for under the 1992 Plan by operation of the broad definition of claim pursuant to 11 U.S.C. § 101(5)(A) and the holding in *Holland v. Double G Coal Co.*, 898 F.Supp. 351 (S.D.W.Va.1995). As for the UMWA, the NBCWA is a pre-petition contract and therefore, any rights under such collective bargaining agreement, whether or not modified or rejected, are claims within these bankruptcy proceedings, with any potential breach of any right giving rise to a damage claim within the bankruptcy cases, pursuant to 11 U.S.C. § 101(5)(B).

## B. Sale Free and Clear of Any Interest

The Bankruptcy Code in § 363(f) states:

(f) The [debtor in possession] may sell property under subsection (b) ... of this section **free and clear of any interest** in such property of an entity other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;·

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f) (emphasis added).

In order to understand the genesis of case law referred to below that allows sales free and clear of any interests, including such interests as the UMWA and 1992 Plan, it is important to understand certain fundamental concepts in bankruptcy law. When these Debtors sought protection under the Bankruptcy Code, estates were created, consisting of all of the property of the Debtors and as defined under 11 U.S.C. § 541. As described above, the 1992 Plan and UMWA have claims pursuant to 11 U.S.C. § 101(5) within these bankruptcy estates even though such claims may be contingent or unmatured, and resolution of these claims are within this Court's jurisdiction pursuant to 11 U.S.C. § 502. In a liquidating Chapter 11, the only method to satisfy claims is through the sale of property as proposed by these Debtors pursuant to § 363 of the Bankruptcy Code. The claims of all credi-

---

curing the agreement of the successor to assume the Employer's obligations under this agreement. Immediately upon the conclusion of such sale, conveyance, assignment or transfer of its operations, the Employer shall notify the Union of the transaction. Such notification shall by certified mail to the Secretary-Treasurer of the International Union and shall

be accompanied by documentation that the successor obligation has been satisfied.

5. See February 28, 1996 Order allowing UMWA employees monetary damages if Debtors breached Article I of the NBCWA. This Court does not express an opinion of whether a breach of the NBCWA occurs as a result of this auction, as such a finding is not ripe for adjudication.

tors in these cases will attach to the proceeds of the sale.

▮ The well established rule that sales within a bankruptcy proceeding occur free and clear of any interest is founded upon the principle that good faith purchasers receive clean title to the property and that any claims against the property attach to the proceeds. Accordingly, the definition of "interest" has been interpreted broadly, although not limitless. This channeling effect of claims to the proceeds protects good faith purchasers and thus encourages full value offers to bankruptcy estates. The channeling of claims to proceeds also precludes creditors from receiving preferential treatment and ensures that all creditors are treated according to the priorities of distribution as established by Congress in the Bankruptcy Code.[6]

As stated by the Second Circuit:

In *Van Huffel v. Harkelrode,* 284 U.S. 225, 52 S.Ct. 115, 76 L.Ed. 256 (1931), the Supreme Court explained that even absent express statutory authority, the Bankruptcy Court had the inherent equitable power to sell a debtor's property and to transfer third-party interests to the proceeds of the sale. 284 U.S. at 227–228, 52 S.Ct. at 116. See also *Ray v. Norseworthy,* 90 U.S. (23 Wall.) 128, 134–135, 23 L.Ed. 116 (1874) (court may sell bankrupt's property encumbered by third party claims as long as third parties retain their respective priorities in the proceeds of the sale); *Fierman v. Seward National Bank,* 37 F.2d 11, 13 (2d Cir.1930) ("When the bankrupt's property was sold free of liens, the liens upon the property became rights against the substituted proceeds of sale, and claimants to this fund were obliged to assert their rights by applying to the court in whose custody it was."); *In re Penn Central Transportation Co.,* 383 F.Supp. 1128, 1130 (E.D.Pa.1974) (power of a reorganization court to transfer interests in debtor's property to the proceeds of a sale is well established).

*In re Johns–Manville Corporation,* 837 F.2d 89, 93 (2d Cir.1988), *cert. denied,* 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988).

Extensive case law exists that claims are directed to the proceeds of a free and clear sale of property and may not subsequently be asserted against a successor. *In re Johns–Manville Corporation,* 837 F.2d 89 (2d Cir.1988), *cert. denied,* 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988) (channeling of claims to proceeds consistent with intent of sale free and clear under § 363(f)); *In re New England Fish Co.,* 19 B.R. 323 (Bankr. W.D.Wash.1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); *In re Robert Hoffman,* 53 B.R. 874 (Bankr.D.R.I. 1985), *aff'd,* 65 B.R. 985 (D.R.I.1986) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); *In re All American of Ashburn, Inc.,* 56 B.R. 186 (Bankr.N.D.Ga. 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); *International Union, Etc. v. Morse Tool, Inc.,* 85 B.R. 666 (D.Mass.1988) (district court upheld bankruptcy court order selling assets free and clear of all encumbrances including collective bargaining agreements); *In re Paris Industries Corp.,* 132 B.R. 504 (D.Me.1991) (free and clear sale enabled bankruptcy court to enjoin product liability claims as asserted against purchaser); *In re WBQ Partnership,* 189 B.R. 97 (Bankr. E.D.Va.1995) (State of Virginia's right to recapture depreciation is an interest as used in § 363(f)).

▮ The UMWA asserts that the decision in *Morse Tool* is not persuasive as the

---

**6.** It is conceptually difficult to understand how an unsecured creditor can assert that they are to be excluded from the definition of "interests" as utilized in the Bankruptcy Code in § 363(f). Such exclusion would result in an unsecured creditor later asserting the same claim against a good faith purchaser, which would disrupt, and give priority and preference to an unsecured creditor. It is clear in the Bankruptcy Code that a secured creditor receives payment from proceeds before payment to an unsecured creditor and it is also clear that a bankruptcy sale is free and clear of a secured creditor's claim. This Court cannot find any legislative history or case law that would support such an elevation of an unsecured claimant which is effectively the grant of relief the UMWA and the 1992 Plan seek by their objections.

collective bargaining agreement which was determined to be an interest as utilized in § 363(f) did not contain a successorship clause as contained in Article I of the NBCWA. There is nothing in this opinion as issued by the district court which would lead to this conclusion, as the collective bargaining agreements are not quoted in part or in whole. The issue before the court was whether to uphold the bankruptcy court's decision to allow a sale free and clear of the collective bargaining agreements over the objection of the UAW, or reverse the bankruptcy court decision and provide that the sale was subject to the collective bargaining agreements. It is clear from the *Morse Tool* decision that the district court allowed a sale free and clear of the collective bargaining agreement.

Likewise, the *In re All American of Ashburn, Inc.* case is incorrectly cited by the UMWA.[7] This case as cited above dealt with the issue of whether a Chapter 7 trustee's sale of assets free and clear of claims precludes product liability actions against the successor, when such actions arose prior to the bankruptcy sale. The bankruptcy court was persuaded by the argument of the purchaser which stated in part:

On this point, [the purchaser] argues that the Court should apply the reasoning set forth in *Forde v. Kee–Lox Manufacturing Co., Inc.*, 437 F.Supp. 631 (W.D.N.Y. 1977), *aff'd on other grounds*, 584 F.2d 4 (2d Cir.1978), and *Rubinstein v. Alaska Pacific Consortium (In re New England Fish Co.)*, 19 B.R. 323 (Bankr.W.D.Wash. 1982). In these cases, the courts held that a sale of the debtor's assets, approved by the Bankruptcy Court as free and clear of all claims, precludes the application of the successor doctrine against a purchaser of those assets in a suit based on the debtor's alleged employment discrimination and violation of employees' civil rights.

The *Forde* case sets out two policies against allowing successor liability to follow bankruptcy sales. The first is that if a plaintiff asserts a claim grounded on suc-

cessor liability after a bankruptcy sale, he, in effect, receives a priority over those claims which were paid in accordance with the Bankruptcy Code. *Forde*, 437 F.Supp. at 633. The result is that the successor liability theory would rearrange the priority scheme established by the Bankruptcy Code. *Id.* The other reason is the negative impact that potential successor liability claims would have on the trustee's ability to sell assets of the estate at a fair price. *Id.* at 633–634.

The Bankruptcy Court in *Rubinstein* also applied these two principles. In doing so, the Court relied on the mandate of the United States Supreme Court in *Nathanson v. National Labor Relations Board*, 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952), that "[t]he theme of the Bankruptcy Act is 'equality of distribution' (*Sampsell v. Imperial Paper Corp.*, 313 U.S. 215 [61 S.Ct. 904, 85 L.Ed. 1293]); and if one claimant is to be preferred over the other, the purpose should be clear from the statute." *Rubinstein*, 19 B.R. at 326. . . . Finding no suggestion that Congress intended to allow the successor doctrine to rearrange the priority of distribution established by the Bankruptcy Code, the Court held that the Supreme Court holding in *Nathanson* must prevail over the policies in allowing successor liability in civil rights cases. *Id.*

*In re All American Ashburn, Inc.* at 189–190.

The Court finds a number of problems with the fundamental argument that a purchaser must assume the NBCWA. Foremost, the UMWA ignores the fact that this venture has failed financially. This venture that brought together employees under a UMWA agreement with owners and creditors has failed to generate sufficient revenues to pay the costs for which the venture was liable. The business is closed and at closure both union and non-union employees were not paid for several weeks of wages. The millions of dollars of unpaid post-petition

7. The UMWA refers to this case as a shareholder derivative action based upon 805 F.2d 1515 (11 Cir.1986), which was the affirming case incorrectly cited by Shepards and cited in this Court's Order of February 28, 1996. This Court in its February 28, 1996 Order and this Memorandum relies upon the bankruptcy court decision as found in 56 B.R. 186.

and pre-petition claims in the cases make it folly to think that anyone would lend money to restart the operations.

The implication from the argument of the UMWA is that these Debtors or their officers intentionally scuttled these operations to create the necessity for a sale. During the pendency of these bankruptcy proceedings, the Debtors have been required to file monthly financial information, which included a detailed accounting of expenses. At the filing of these bankruptcy petitions, the Debtors were required to disclose in their schedules transfers of assets outside the normal course of business as well as transactions with professionals and insiders. Officers and shareholders of the Debtors have been available for discovery and testimony under oath in addition to the financial records of the Debtors. Despite the discovery tools or financial reporting available to creditors or other parties-in-interest, no evidence has been presented or produced to this Court which would indicate improper transfers that could have been recovered to allow these Debtors to continue to operate. In fact, a review of the unpaid administrative expenses and claims in these cases reveal that it is the claims of Workers Compensation, UMWA Funds, suppliers, employees, landlords, secured creditors and administrative expense creditors that simply outstripped the revenues generated by the Debtors.

The Bankruptcy Code provides a means of insuring the best possible result from the sale or liquidation of a business' assets once reorganization is no longer possible. All property of value can be sold free and clear of liens and other interests at a well advertised auction. The rights of buyers at a bankruptcy sale free and clear of liens and other interests are given this protection to insure that the best offers are made and as many claims as possible are paid from the sale proceeds. Any entity that purchases the Debtors' assets must abide by all applicable federal and state laws once a sale is accomplished, including the protections afforded by the National Labor Relations Act, which provides a mechanism for election of a collecting bargaining representa-

tative. Further, a buyer does not escape any independent liability to the 1992 Plan or any other creditor of the Debtors as conduct, actions, or history particular to a buyer is not altered by making a purchase free and clear under § 363. However, the obligations of these Debtors, including accrued and unaccrued liabilities of the 1992 Plan, UMWA, and taxing authorities, must be satisfied by looking to the proceeds received by the Debtors from the auction of the Debtors' assets. Therefore, it is now time for the UMWA and the 1992 Plan to do what every creditor has a right to do at such a sale; encourage bidders who they would like to have operate these properties [8], consider investing in or becoming an owner of the enterprise, or enter into an agreement with a buyer to assure that some of the profitability problems of the past are solved upon purchase of the Debtors' assets.

As cited above, in quoting the *Rubinstein* case, the Supreme Court has made it clear that a statute must be clear as to successor liability if such liability is intended to disrupt the priorities of the Bankruptcy Code. The 1992 Plan has yet to provide a clear definition of successor as utilized in the Coal Act which would disrupt the priority scheme in these bankruptcy cases. The case law cited by the 1992 Plan is not remotely on point to the facts presented in this case. First, in *Zerand–Bernal Group, Inc. v. Cox*, 23 F.3d 159 (7th Cir.1994), the issue raised was whether product liability claims, arising subsequent to the sale of property and the closing of the bankruptcy case, could be asserted against the purchaser. The Seventh Circuit found that since the debtors were no longer in existence, the bankruptcy court did not maintain any "related to" jurisdiction and the bankruptcy court's previous injunction against product liability claims was ineffective to claimants who did not have notice of the sale and an opportunity to protect their claims. In this case, full notice of the sale has been provided to the 1992 Plan and the 1992 Plan's right to share in the proceeds has not been curtailed.

---

**8.** Perhaps, a buyer will agree to assume a portion

or all of the claims of the objecting creditors.

Further, the 1992 Plan appears to believe that the Debtors' requested relief results in a discharge of the 1992 Plan's claims. However, the issue presented before this Court is not whether the claims are dischargeable in these bankruptcy proceedings as in *LTV Steel Co. v. Shalala (In re Chateaugay)*, 53 F.3d 478 (2d Cir.1995), but whether property may be sold free and clear of the 1992 Plan's interests. The Debtors are not seeking a discharge of the claims of the objecting parties but to get the best possible value from the estate property to pay as many claims as possible. For the same reasons, this Court believes that the 1992 Plan's reliance upon 11 U.S.C. § 524(e), which states in part "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt", is misplaced. Again, the Court has not been requested nor is it considering a discharge of any of these Debtors or of any purchaser. Rather, the Debtors' motion contemplates a public auction of property free and clear of interests. These contentions by counsel for the 1992 Plan are bordering on meritless arguments. One court imposed Bankruptcy Rule 9011 sanctions for an objection by a taxing authority in a free and clear sale which was based in part on the assertion that tax liens are nondischargeable. *In re Cardi Const. Co., Inc.*, 154 B.R. 403 (Bankr.D.R.I. 1993).

Finally, both objecting parties believe that since a free and clear sale does not include their interests they are allowed to later assert successor claims against the purchaser. However, since this Court believes that the 1992 Plan and UMWA are interests as utilized in § 363(f), successor liability is cut-off and the objecting creditors must look to the sale proceeds not the purchaser for satisfaction of claims. All claims against these Debtors shall attach to the proceeds to the sale and may not be asserted against any successor.

■ However, in the alternative, this Court addresses the 1992 Plan's assertion that successor liability exists under the Coal Act as it relates to the sale of assets in these bankruptcy estates.[9] First, the 1992 Plan concedes that if the individual assets of the Debtors' estates were sold piecemeal, no "reach forward" or successor liability would exist. Presumably, there is some point between the sale to a hundred different buyers and the sale to one entity, at which successor liability applies as argued by the 1992 Plan, although the 1992 Plan has not been able to articulate the same. By looking at the statute which created the liability, 26 U.S.C. § 9712, we cannot find at what point successor-in-interest liability is created. There is no question of the 1992 Plan's right to "reach back" under the provisions of the Coal Act, based upon existing case law interpreting such provisions. *See Carbon Fuel Co. v. USX Corp.*, 891 F.Supp. 1186 (S.D.W.Va. 1995). However, there is no case law and the statute gives no clear right for the 1992 Plan to "reach forward".

■ The legislation is clear that the 1992 Plan is empowered to reach back to the most recent former employer if the primary obligor is no longer able to pay premiums, but there is no similar provision in the 1992 Plan which authorizes this Court or the Social Security Administration to "reach forward" to successor-in-interests, despite the gratuitous language in the Coal Act that indicates successors may be liable under some circumstances. *See* 26 U.S.C. §§ 9701, 9711, and 9712. It seems from the language of the Coal Act that the inclusion of "successor in interest" and "successor" was to prevent non-arms length transactions or sales between related parties from extinguishing liability of a responsible operator. Nothing in the Coal Act that would indicate a sale of a debtor's property by a secured party at a foreclosure sale or the sale by a debtor in possession (or trustee) under § 363 is not free and clear of the claim that the 1992 Plan seeks to impose a against a buyer in these cases, if it can be shown that the sale is (1) noticed and advertised to all parties as a sale

---

**9.** This Court notes that the 1992 Plan provides a "wish list" test of successor in its Supplemental Brief in Support of Objections to Sale Motion (p. 13–14), although the test is not supported upon any existing theory of successor liability, i.e. labor law, Black Lung Fund, tax law or any other appropriate test.

free and clear of liens and other interests, (2) not to a related party, and (3) meets the good faith requirements of § 363.

Upon a finding that the term "any interest" as utilized in 11 U.S.C. § 363(f) includes the interests of the objecting parties in this proceeding, one of the five conditions under § 363(f), as quoted above, must be satisfied. The Court finds that the interests of the UMWA and the 1992 Plan fall under subsection (5) of § 363(f), which permits a sale free and clear of any interest if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." All of the claims asserted by the objecting parties may be compensable in a money satisfaction. In *In re WBQ Partnership* at 107, the bankruptcy court found that it is a "hypothetical" satisfaction under (f)(5), since the subsection uses "could be" compelled and not "must be" or "shall be" compelled. For these reasons, the Debtors have satisfied the elements of 11 U.S.C. § 363(f) and this Court finds that the objections of the UMWA and the 1992 Plan should be overruled.

## RECOMMENDATION TO DISTRICT COURT

If these recommendations are accepted, this Court shall enter an Order encompassing the findings as it relates to the Debtors' Motion as set forth in the March 13, 1996 hearing and contained in Exhibit B. For the reasons set forth herein, it is recommended that the District Court overrule the objections of the 1992 Plan and UMWA as the interests of these objecting parties are claims within these bankruptcy proceedings which may be sold free and clear of at a bankruptcy auction sale under § 363 of the Bankruptcy Code.

ENTERED: MARCH 29, 1996

### EXHIBIT A

John A. Rollins—counsel for Debtors

Susan Cannon–Ryan—counsel for UMWA 1992 Benefit Plan

Steven Thompson—counsel for Chicopee Coal

Marilyn Baker—counsel for UMWA Health and Retirement Fund

Christopher Clarke—counsel for UMWA Health and Retirement Fund

Thomas Vanderford—counsel for CIT

Michael Ramada—counsel for Genesis Equipment

Arthur M. Standish—counsel for United Coal

Mike Funk—counsel for United Coal

Tom Gilpin—counsel for Van–American Insurance, New Gauley Coal and Clarendon Insurance Co.

Richard Stephenson—counsel for WV Workers' Compensation, Unemployment

Jack Alsop—counsel for estate of Mr. Post

William F. Dobbs, Jr.—counsel for Westmoreland Coal, Caterpillar and Westvaco

James McHugh—counsel for Simmons–Rand

Michael T. Chaney—counsel for Ford Motor Credit

Michael Niggemyer—counsel for UMWA District 17

Randolph McGraw—counsel for UMWA District 17

Molly Kettler Wade—counsel for UMWA Employees

Robert Weinberger—Assistant U.S. Trustee

William E. Hamb—counsel for Georgia Pacific

Helen Morris—Chapter 7 Trustee for M & H Coal Company

### EXHIBIT B

1. Due and proper notice of the hearing and the Debtors' Motion have been given in accordance with 11 U.S.C. § 363 and Rules 2002 and 6004 of the Rules of Bankruptcy Procedure as creditors and parties-in-interest have been provided more than the twenty (20) days notice as required by the Bankruptcy Rules;

2. The proposed procedure for the auction sale of the assets of the Debtors' bankruptcy estate is fair and commercially reasonable under the circumstances presented;

3. Good cause exists to authorize the Debtors to sell substantially all of the assets of their bankruptcy estates prior to the consideration of any disclosure statement and plan

of reorganization and the auction sale has been advanced in good faith by the Debtors. Such cause includes the fact that rapid deterioration of the value of the Debtors' assets will occur over a short period of time and the costs necessary to maintain such assets are extensive to Debtors who have no income or financial resources with which to provide long term maintenance. Absent a prompt sale of assets, these bankruptcy estates will suffer irreparable harm;

4. The terms of sale requested by the Debtors were approved, except for the provision which allowed the Debtors to offer a percentage price reduction for bidders willing to assume certain liabilities of the United Mine Workers of America ("UMWA") and the United Mine Workers' Health and Retirement Funds ("UMWA Funds"). The Court found that such proposed reduction by the Debtors of the highest bid by 40% was arbitrary and not supported by any objective evidence. However, the Court shall consider and allow the parties desiring to bid in advance or at the auction to designate any liability to be assumed in addition to their cash bids and in such a way to allow the market to determine the value of assuming any existing liability of the Debtors. In the event of multiple bids, the Debtors or other parties with standing may address such matters to the Court at the hearing scheduled on April 23, 1996;

5. Equipment, as defined in the Interim Order entered March 27, 1996, sold at the auction shall be free and clear of any lien and interest upon completion of the auction. All other sales shall be deemed to be free and clear of interests only if the District Court overrules the objections of the 1992 Plan and UMWA. Such sales may include the assignment of leases and executory contracts of the Debtors provided that, at a sale confirmation hearing, the Court determines in the case of each asset(s) sold whether:

 (a) The auction sale is to a good faith purchaser without any collusion or fraud; and

 (b) The Lessor or other party to the lease or executory contract shall receive prompt cure of all defaults and has been provided adequate assurance of future performance of the applicable lease or contract to be assigned, to the of future performance of the applicable lease or contract to be assigned, to the extent required under the provision of 11 U.S.C. § 365(b) and (f). No provision of this Order, including determination of a sale free and clear of any interests, shall be deemed to determine or resolve what sums or other performance may be due by the Debtors or any assignee of a lease or executory contract or impliedly modify the terms of such contracts;

6. All sales to various purchasers of Equipment, as defined in the Interim Order entered March 27, 1996, at auction shall be authorized, free and clear of interests identified in the Debtors' Motion, pursuant to 11 U.S.C. § 363(f), due to the fact that all holders of such liens, claims or other interests either:

 (i) could be compelled, in a legal or equitable proceeding, to accept money in satisfaction of their interests, within the meaning of Section 363(f)(5);

 (ii) hold such interest subject to a bona fide dispute, within the meaning of Section 363(f)(4); or

 (iii) hold an interest in the property that is a lien and the price at which the property is to be sold is higher than the aggregate value of all liens on such property within the meaning of Section 363(f)(3) or is disputed, and such lienholders are adequately protected in that they may bid at the auction sale and offset such bids by the amount of their claims;

7. Except as conditioned below, the sale of the Debtors' assets shall be a sale free and clear of all liens and interests identified below and all claims held by any creditor or party in interest in this case against the Debtors, their bankruptcy estates or the assets to be sold, existing as of the date of sale or which arise after closing of the sale but arise from, or are incurred in whole or in part by reason of the Debtors' ownership or operation of the property sold or calculated by reference to the Debtors or their assets or operation for a time period prior to closing. With the exception of liabilities specifically

assumed in writing by a purchaser, at closing or by its assumption of the liabilities imposed by assignment of a lease, executory contract or permit assigned it, a purchaser of the Equipment or Real Estate, as the same are defined in the Interim Order entered March 27, 1997, at auction shall not, merely by reason of such purchase or the use of such assets, be liable for any such debts or liabilities of any of Debtors that may be otherwise assertable against such purchasers becoming a successor, successor in interest or by other operation of law under the terms of a statute, judicial doctrine, or other provision of law, subject to the limitations set forth herein. The claims which are not subject to being assumed by a purchaser absent an express assumption in writing, include the existing or future payment or obligation of any of the Debtors to pay:

(i) employee wages and benefits; Mine Health and Safety Act of 1969, as amended, or any other similar state or federal statute, including, without limitation, obligations to provide health benefits or to pay premiums for retirees, employees, former employees, or dependents of the foregoing or of any other person;

(iii) payments to any multi-employer pension or benefit fund, including, without any limitation, withdrawal liability;

(iv) claims for personal injury or property damage or other claims arising prior to the closing;

(v) taxes, assessments, premiums, and other sums due for events occurring prior to closing;

(vi) fees, penalties or other assessments of any nature incurred by any of the Debtors, including, without limitation, fines or penalties due to any outstanding notice of violation issued by any permitting or other governmental authority;

(vii) overriding royalties or sales commissions to any parties not specifically provided by the lease or executory contract assigned to such purchaser; and

(viii) any other liabilities or claims now existing against any of the Debtors not expressly assumed by any purchaser, whether contingent, absolute, liquidated or unliquidated, perfected or unperfected, including any sums due from cessation of Debtors' operations or dismissal of employees.

The Debtors' also propose to sell assets free and clear of the interests, as defined in this paragraph, of the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act") and labor or collective bargaining agreements to which the Debtors are parties. The UMWA Funds and UMWA objections relate to such proposal and are addressed herein in the recommended findings of fact and conclusions of law as to be submitted along with this Order to the District Court.