In re WESTMORELAND COAL
COMPANY, EIN 23–1128670,
et al., Debtors.

Michael BUCKNER, Elliott Segal, and
Frank Dunham, as Trustees of the Unit-
ed Mine Workers of America 1992 Bene-
fit Plan, Plaintiffs,

v.

WESTMORELAND COAL COMPANY,
Westmoreland Coal Sales Company,
Inc., Westmoreland Energy, Inc., West-
moreland Resources, Inc., Westmoreland
Terminal Company, Defendants.

Bankruptcy No. 96–26092 MSK,
Adversary No. 97–1058 MSK.

United States Bankruptcy Court,
D. Colorado.

Sept. 5, 1997.

Craig A. Christensen, Thomas C. Seawell, Denver, CO, Thomas P. Gies, Washington, DC, for Debtors.

Jami Wintz McKeon, Morgan, Lewis & Bockius, L.L.P., Philadelphia, PA, for Frank

Dunham and Elliot as Trustees of United Mine Workers of America 1992 Benefit Plan.

Joan B. Burleson, Denver, CO, for. UMWA 1992 Benefit Plan.

## MEMORANDUM OPINION AND ORDER

MARCIA S. KRIEGER, Bankruptcy Judge. ·

THIS MATTER comes before the Court on the Motion for Summary Judgment (Motion) brought by the Trustees of the United Mine Workers of America 1992 Benefit Plan (the Trustees) against Debtor Westmoreland Coal Company and its subsidiaries. All Defendants responded. Having reviewed the file, Motion, responses, replies and affidavits and other documents submitted in accordance with Fed. R. Bankr.P.7056 (which incorporates the provisions of Fed.R.Civ.P. 56), the Court finds and concludes as follows:

### I. JURISDICTION

This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a). This is a core proceeding. 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

### II. PROCEDURAL HISTORY

Westmoreland Coal Company (Westmoreland) and four of its subsidiaries, Westmoreland Resources, Inc., Westmoreland Energy, Inc., Westmoreland Coal Sales Company and Westmoreland Terminal Company (the subsidiaries) filed voluntary petitions under Chapter 11 of the Bankruptcy Code on December 23, 1996. By Order of January 13, 1997, the cases are being jointly administered. On January 17, 1997, the Trustees filed a· motion in the underlying cases to compel Westmoreland to reinstate its Individual Employer Plan (IEP) in accordance with § 9711 of the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. § 9701, et seq. (Coal Act) and to compel postpetition payment of premiums pursuant to § 9712 of the Coal Act as administrative expenses. On the same day the Trustees also initiated this adversary proceeding in which essentially the same relief is requested. The Motion and the adversary proceeding were therefore consolidated and, by agreement of the parties, the Motion is now treated as one for summary judgment.

### III. SUMMARY JUDGMENT

The purpose of Rule 56, which allows for entry of summary judgment, is to pierce pleadings and allow for summary disposition of legal issues where there is no factual dispute. Summary judgment is appropriate when there is no genuine dispute as to material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Bankr.P. 7056. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Russillo v. Scarborough*, 935 F.2d 1167, 1170 (10th Cir.1991). In considering a motion for summary judgment, the factual record must be considered in the light most favorable to the party opposing the motion. *Cone v. Longmont United Hospital Ass'n*, 14 F.3d 526, 528 (10th Cir.1994). If all material facts are undisputed, summary judgment may be rendered in favor of the opposing party even though no formal cross-motion has been made. *Dickeson v. Quarberg*, 844 F.2d 1435, 1444 n. 8 (10th Cir.1988); *Pueblo of Santa Ana v. Mountain States Tel. & Tel. Co.*, 734 F.2d 1402, 1408 (10th Cir. 1984), *rev'd on other grounds*, 472 U.S. 237, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985), *both quoting* 10A C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE & PROCEDURE: CIVIL 2d § 2720.

Although lengthy factual recitations have been offered and volumes of documents supplied in support of and in opposition to the Motion, the material, undisputed facts are relatively few. Plaintiffs are Trustees of the United Mine Workers 1992 Benefit Plan (1992 Plan), an irrevocable trust created by the Coal Act. Defendant Westmoreland is a "last signatory operator" subject to § 9711 of the Coal Act. Section 9711 requires provision of medical benefits to retirees and their families through the collectively-bargained IEP of a last signatory operator. Westmoreland is also subject to § 9712 of the Coal Act which requires payment of monthly per beneficiary premiums to the 1992 Plan for its

coverage of retirees and their dependents previously covered but no longer receiving benefits through an IEP and annual prefunding premiums to the 1992 Plan for "orphaned" beneficiaries, i.e., those whose employers have gone out of business. By agreement dated August 21, 1996 (Pledge Agreement), Westmoreland secured performance of these obligations by pledging its shares in Westmoreland Energy, Inc., Westmoreland Coal Sales Co. and Westmoreland Resources, Inc. to the 1992 Plan and Combined Benefit Fund (Combined Fund).

Westmoreland provided benefits in compliance with § 9711 until November 26, 1996 when it terminated its IEP. Five days later, the Trustees filed suit against Westmoreland in the United States District Court for the Western District of Virginia seeking to compel Westmoreland to reestablish its IEP. Upon consideration of the Trustees' motion for a preliminary mandatory injunction, the court found that following termination of Westmoreland's IEP all of the covered beneficiaries had been absorbed into the 1992 Plan. As a consequence, there was no immediate or irreparable harm to the beneficiaries. The Court was concerned, however, that Westmoreland, suffering from uncontradicted financial difficulties, might become insolvent through dissipation of its assets and therefore unable to fulfill its payment obligations under the Coal Act. In order to preserve Westmoreland's ability to respond to an ultimate judgment in the case, the court enjoined Westmoreland from taking any action not in its ordinary course of business and required it to pay the 1992 Plan $200,000 per week pending a final resolution of the dispute.[1]

Westmoreland made one payment, then filed for bankruptcy protection under Chapter 11. Westmoreland admits that the precipitating cause and primary focus of its bankruptcy are its Coal Act liabilities. Since its bankruptcy filing, Westmoreland has not reinstituted its IEP, has not paid any monthly per beneficiary premiums to the 1992 Plan for beneficiaries previously covered by its IEP, and has not paid the 1997 annual pre-

funding premium assessed by the 1992 Plan for orphan beneficiaries.

The Trustees seek a mandatory injunction requiring Westmoreland to reestablish its IEP and a declaration that Westmoreland's Coal Act payment obligations under § 9712 are entitled to priority as administrative expenses under § 503(b)(1)(A) or (B) of the Bankruptcy Code. The undisputed facts are sufficient for resolution of these claims as a matter of law. Both parties agree that Westmoreland has statutory obligations under the Coal Act. The issue before this Court is how claims arising from these statutory obligations will be treated in the bankruptcy process. The undisputed facts are not sufficient, however, to determine either the Trustees' claims against the subsidiaries or the Defendants' counterclaims and defenses. These matters are reserved for trial scheduled for December 2 through 4, 1997.

## IV. ANALYSIS

The Trustees argue that Westmoreland should not be allowed to escape its Coal Act obligations by reorganizing in bankruptcy because the Coal Act anticipates that a coal operator will continue to provide for industry retirees and their families whether or not the operator remains in business. *Holland v. Double G. Coal Co.*, 898 F.Supp. 351, 354–55 (S.D.W.Va.1995). ("Congress must have intended § 9712 of the Coal Act to apply to all 1988 last signatory operators, whether or not they remain in business.") Since Westmoreland is operating as a debtor-in-possession under Chapter 11, the Trustees argue that the Coal Act's underlying social policy requires Westmoreland to reinstitute its IEP. The Trustees contend that if Westmoreland is not compelled to perform such obligations postpetition, other coal operators will resort to bankruptcy as a tool to avoid the effect of the Coal Act. The Trustees also assert that claims arising under § 9712 should be given administrative expense priority. Westmoreland responds that its Coal Act obligations are prepetition debts, not entitled to administrative expense priority under §§ 503(b)(1)(A) or (B), and not subject to enforcement by mandatory injunction.

---

1. Opinion and Order, *Buckner v. Westmoreland*     *Coal Co.,* No. 96–1087A (W.D.Va. Dec. 5, 1996).

The Trustees' argument has obvious emotional appeal. Few would disagree with the desirability of providing medical care benefits for retired coal miners and their families. The Trustees' position also embodies the lament of every creditor in every bankruptcy case—that the bankruptcy system is unfair because it allows debtors to avoid their lawful obligations. The Trustees, however, have presented no evidence establishing that coal industry retirees or their families are in jeopardy of losing medical benefits or that failure to accord Coal Act claims administrative priority status will trigger a stampede of coal operators into bankruptcy. Indeed, the District Court for the Western District of Virginia found that the beneficiaries of Westmoreland's IEP are receiving benefits paid by the 1992 Plan under § 9712. Apparently the 1992 Plan is currently assessing, and presumably collecting, the cost of the benefits for Westmoreland retirees and orphaned beneficiaries from operating coal producers other than Westmoreland.

It is also important to remember that the objectives and purposes of the Bankruptcy Code frequently differ from social policy which gives rise to legislation such as the Coal Act. For individuals and businesses who find themselves hopelessly adrift in a sea of debt, bankruptcy provides an opportunity to reorganize financial affairs, repay debts over time, liquidate assets and, in some circumstances, obtain a discharge. For creditors, the statutory framework provides a predictable and orderly system for liquidation or reorganization of the debtor with repayment through equitable distribution. The bankruptcy system is intended to act as a comprehensive process for resolution of all of a debtor's financial obligations. This is particularly the case in Chapter 11. As stated by the Tenth Circuit Court of Appeals in *Sheet Metal Workers' Int'l Ass'n v. Mile Hi Metal Systems, Inc. (In re Mile Hi Metal Systems, Inc.)*, 899 F.2d 887, 891 (10th Cir.1990):

> The Bankruptcy Code cuts across a broad spectrum of other areas of law in order to allow debtors the opportunity to reorganize. . . . We recognize the strong national policies which protect workers from unfair labor practices and ensure the enforceability of collective bargaining agreements. . . . But Chapter 11 of the Bankruptcy Code reflects an equally strong public policy "to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources," *quoting from NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984).

■ Venerable authority teaches that the social policy of non-bankruptcy law, whether of federal or state origin, is satisfied by recognition of a claim in the bankruptcy process. Non-bankruptcy law determines the existence, enforceability and amount of a claim; bankruptcy law determines the treatment of the claim in the bankruptcy process. *Nathanson v. NLRB*, 344 U.S. 25, 28, 73 S.Ct. 80, 82–83, 97 L.Ed. 23 (1952). In *Nathanson*, the Supreme Court was presented with the question of whether a debtor's obligation to pay reparations for unfair labor practices under the National Labor Relations Act (NLRA) was to be given administrative expense priority under the Bankruptcy Act. The National Labor Relations Board argued that the social policy behind the NLRA justified administrative expense priority. The Supreme Court disagreed, holding that treatment of the claim in the bankruptcy process was governed by the Bankruptcy Act.

> The Board argues that the interest of the United States in eradicating unfair labor practices is so great that the back pay order should be given the additional sanction of priority in payment. Whether that should be done is a legislative decision. The contest now is no longer between employees and management but between various classes of creditors. The policy of the National Labor Relations Act is fully served by recognizing the claim for back pay as one to be paid from the estate. The question whether it should be paid in preference to other creditors is a question to be answered from the Bankruptcy Act.

*Nathanson*, 344 U.S. at 28–29, 73 S.Ct. at 82–83.

■ This reasoning is consistent with recent Supreme Court and Tenth Circuit decisions which preclude bankruptcy courts from

modifying the Bankruptcy Code's priority scheme. *See: United States v. Noland,* —— U.S. ——, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) (tax claims cannot be equitably subordinated on a categorical basis in derogation of Congress' scheme of priorities); *U.S. v. CF & I Fabricators of Utah, Inc.,* —— U.S. ——, —— – ——, 116 S.Ct. 2106, 2114–15, 135 L.Ed.2d 506 (1996) (categorical reordering of priorities takes place at the legislative level of consideration; it is beyond the scope of judicial authority to order equitable subordination except under § 510(c)); *SBA v. Preferred Door Co., Inc. (In re Preferred Door Co., Inc.),* 990 F.2d 547, 550 (10th Cir.1993) (when the Code places a claim in a specific position with respect to priority, a bankruptcy court is "without equitable power to place it in any other position"). When determining the priority and treatment of particular claims in the bankruptcy process, there is no balancing of the social policy of non-bankruptcy law against the social policy of bankruptcy law; bankruptcy law alone governs.

■ The analytical approach for determining the priority of claims in bankruptcy is a two-step process. First, the existence and nature of a claim is determined under non-bankruptcy law. Then, the court applies bankruptcy law to determine its treatment and priority in the bankruptcy process.

## A. The Trustees' Coal Act Claims against Westmoreland

The events leading up to the enactment of the Coal Act in 1992 have been described in detail elsewhere and need not be thoroughly recounted here.[2] However, a brief history is helpful in understanding the nature of the Trustees' claims.

Beginning in 1946, coal miners received pension and health benefits pursuant to a series of employer-funded plans negotiated by their unions, the United Mine Workers of America (UMWA) and the Bituminous Coal Operators Association (BCOA). From 1974 through 1978, non-pension benefits were provided under two plans—the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan. In 1978, the UMWA and BCOA partially decentralized the scheme in the National Bituminous Coal Wage Act (NBCWA) by agreeing that each miner retiring after January 1, 1976, would receive health benefits pursuant to a plan created and funded by his or her last employer and that the 1974 UMWA Benefit Plan would provide health benefits to orphaned retirees and their families.

In the 1980s, the 1950 and 1974 UMWA Benefit Plans suffered serious financial difficulties. Congress responded by enacting the Coal Act. The purpose of the Coal Act was to establish a system whereby each coal operator that was or had been a signatory to a coal wage agreement would pay for the benefits provided to its own retirees and would share in the cost of providing benefits to orphaned retirees.

The Coal Act contains three mechanisms for this purpose.[3] First, it requires continua-

---

**2.** Several reported cases set forth the history of the Coal Act: *United Mine Workers of America 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.),* 99 F.3d 573, 576 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1251, 137 L.Ed.2d 332 (1997); *Blue Diamond Coal Co. v. Shalala (In re Blue Diamond Coal Co.),* 79 F.3d 516, 518–20 (6th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 682, 136 L.Ed.2d 608 (1997); *Davon, Inc. v. Shalala,* 75 F.3d 1114, 1117–19 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996); *LTV Steel Co. v. Shalala (In re Chateaugay, Corp.),* 53 F.3d 478, 481–86 (2nd Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995).

**3.** The pertinent provisions of § 9711 and § 9712 are:

**§ 9711. Continued obligations of individual employer plans.**
(a) Coverage of current recipients.—The last signatory operator of any individual who, as of February 1, 1993, is receiving retiree health benefits from an individual employer plan maintained pursuant to a 1978 or subsequent coal wage agreement shall continue to provide health benefits coverage to such individual and the individual's eligible beneficiaries which is substantially the same as (and subject to all the limitations of) the coverage provided by such plan as of January 1, 1992. Such coverage shall continue to be provided for as long as the last signatory operator (and any related person) remains in business.
(g)(1) Successor.—The term "last signatory operator" shall include a successor in interest of such operator.

**8**

tion of IEPs created pursuant to the 1978 NBCWA.[4] 26 U.S.C. § 9711(a). The second and third mechanisms are the Combined Fund and the 1992 Plan which are primarily financed through per beneficiary premiums payable by coal operators based on the number of individual beneficiaries attributed to them through assignment by the Secretary of Health and Human Services. 26 U.S.C. §§ 9702(a), 9704, 9706, 9712. The Combined Fund covers beneficiaries eligible for and receiving benefits from the UMWA 1974 Benefit Plan and the 1950 Benefit Plan as of July 20, 1992. 26 U.S.C. § 9703(f).[5] The 1992 Plan is essentially the new orphan plan required to provide health benefits to individuals not receiving benefits from either the Combined Fund or their employer's IEP. 26 U.S.C. § 9712(b)(2). *See, Holland v. Double G Coal Co.*, 898 F.Supp. 351, 354 (S.D.W.Va. 1995) (the 1992 Plan was intended as a "backup" to the Combined Fund and IEPs). The Coal Act imposes an ongoing duty on the last signatory operator and its related per-

sons[6] to pay monthly per beneficiary premiums to the 1992 Plan for every month the 1992 Plan provides health benefits to the operator's retirees and annual prefunding premiums for orphans attributable to the operator. 26 U.S.C. § 9712(b)(1)(A) and (B). Last signatory operators may also be required to post security in the form of a bond, letter of credit or cash escrow for payment of their portion of the projected future costs of providing benefits, or if unable to post security, then to pay a greater annual prefunding premium than would otherwise be required.[7] 26 U.S.C. § 9712(d)(1)(C).

The Trustees argue that Westmoreland currently has three independent Coal Act obligations: (1) pursuant to § 9711 Westmoreland is obligated to maintain its IEP; (2) pursuant to § 9712(d)(1)(B) Westmoreland is obligated to pay monthly per beneficiary premiums for beneficiaries previously covered by Westmoreland's IEP, but now provided for by the 1992 Plan; and (3) West-

(2) Reassignment upon purchase.—If a person becomes a successor of a last signatory operator after the enactment date, the last signatory operator may transfer any liability of such operator under this chapter with respect to an eligible beneficiary to such successor, and such successor shall be treated as the last signatory operator with respect to such eligible beneficiary for purposes of this chapter. Notwithstanding the preceding sentence, the last signatory operator transferring such assignment (and any related person) shall remain the guarantor of the benefits provided to the eligible beneficiary under this chapter. A last signatory operator shall notify the trustees of the 1992 UMWA Benefit Plan of any transfer described in this paragraph.

§ 9712. **Establishment and coverage of 1992 UMWA benefit plan.**

(d) Guarantee of benefits.—

(1) In general.—All 1988 last signatory operators shall be responsible for financing the benefits described in subsection (c), in accordance with contribution requirements established in the 1992 UMWA Benefit Plan. Such contribution requirements, which shall be applied uniformly to each 1988 last signatory operator, on the basis of the number of eligible and potentially eligible beneficiaries attributable to each operator, shall include:

(A) the payment of an annual prefunding premium for all eligible and potentially eligible beneficiaries attributable to a 1988 last signatory operator,

(B) the payment of a monthly per beneficiary premium by each 1988 last signatory operator for each eligible beneficiary of such operator

who is described in subsection (b)(2) and who is receiving benefits under the 1992 UMWA Benefit Plan, and

(C) the provision of security (in the form of a bond, letter of credit or cash escrow) in an amount equal to a portion of the projected future cost to the 1992 UMWA Benefit Plan of providing health benefits for eligible and potentially eligible beneficiaries attributable to the 1988 last signatory operator. If a 1988 last signatory operator is unable to provide the security required, the 1992 UMWA Benefit Plan shall require the operator to pay an annual prefunding premium that is greater than the premium otherwise applicable.

4.  *Carbon Fuel Co. v. USX Corp.*, ·891 F.Supp. 1186, 1189–92 (S.D.W.Va.1995), *aff'd in part, remanded in part*, 100 F.3d 1124 (4th Cir.1996), explains the genesis of the IEP.

5.  The Combined Fund is not a party to this proceeding, although it is a named beneficiary of Westmoreland's stock pledge.

6.  "Related persons," defined in § 9701(c)(2), include successors-in-interest and businesses under common control with or by a signatory operator.

7.  As discussed earlier, on August 21, 1996, Westmoreland Coal Company posted its stock in three subsidiaries to secure its obligations under both § 9711 and § 9712. The stock was posted pursuant to a "Pledge Agreement" with the Combined Fund and the 1992 Plan.

moreland is obligated to pay annual prefunding premiums for 1997 and subsequent years to fund benefits for orphaned retirees pursuant to § 9712(d)(1)(A). The Trustees have not yet filed any proofs of claim in this case. Therefore, each alleged obligation must be analyzed. As discussed below, I conclude the first and second obligations are simply alternative remedies for a single liability. This means that there are only two liabilities which can give rise to claims in this case.[8]

■ There is no dispute that as a last signatory operator Westmoreland is required by § 9711 to maintain an IEP, but it terminated the IEP prepetition. Thus, the pertinent question is what remedies are now available to the Trustees for Westmoreland's breach of this obligation. Enforcement powers for all Coal Act obligations are specified in 26 U.S.C. § 9721 which provides:

> Civil Enforcement: The provisions of § 4301 of the Employee Retirement Income Security Act of 1974 shall apply to any claim arising out of an obligation to pay any amount required to be paid by this chapter in the same manner as any claim arising out of an obligation to pay withdrawal liability under subtitle E of Title IV of such Act. For the purposes of the preceding sentence, a signatory operator and related persons shall be treated in the same manner as employers.

Section 4301 of ERISA was enacted as 29 U.S.C. § 1451 which authorizes civil enforcement for ERISA obligations by a plan's fiduciary. It provides in pertinent part:

A plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan, or an employee organization which represents a plan participant or a beneficiary for purposes of collective bargaining, may bring an action for appropriate legal or equitable relief, or both.

Arguably, the Trustees of the 1992 Plan are plan fiduciaries adversely affected by Westmoreland's termination of its IEP because after termination of an IEP the 1992 Plan is obligated to provide benefits to retirees no longer covered. It is on this basis that the 1992 Plan sought mandatory relief in the Virginia District Court to require Westmoreland to reinstate its IEP prior to bankruptcy.

■ Section 9721's reference to withdrawal liability means that a breach of Coal Act obligations, like a breach of ERISA obligations, gives rise to withdrawal liability. *Holland v. High–Tech Collieries, Inc.*, 911 F.Supp. 1021, 1031 (N.D.W.Va.1996). ("[T]he court is to apply the provisions of § 4301 [of ERISA] regarding withdrawal liability to any claim arising out of an obligation to pay health premiums under the Coal Act.") Withdrawal liability is a fixed amount equal to the employer's proportionate share of the plan's unfunded vested employee benefits. *Masters, Mates & Pilots Pension Plan v. USX Corp.*, 900 F.2d 727, 730 (4th Cir. 1990); *Park South Hotel Corp. v. New York Hotel Trades Council*, 851 F.2d 578, 580 (2nd Cir.1988), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988).[9]

8. According to the Declaration of Carl F. Tennille, comptroller of the UMWA Health & Retirement Funds, the termination of Westmoreland's IEP adds approximately 2,400 beneficiaries to the pool covered by the 1992 Plan and increases the premium by 54%. The monthly reimbursement for beneficiaries previously covered by Westmoreland's IEP under § 9712(d)(1)(B), exceeds $500,000 per month.

However, it appears from Mr. Tennille's declaration that the Trustees' § 9712(d)(1)(B) reimbursement claim for 1997 has been collapsed into the annual prefunding obligation under § 9712(d)(1)(A):

> Under § 9712(d)(1)(A) of the Coal Act, for the current plan year of the 1992 Plan (ending December 31, 1997), Westmoreland's annual prefunding premium is the product of the premium rate determined by the 1992 Plan Trust-

ees and the total number of retirees and their dependents receiving benefits from Westmoreland's individual employer health plan under § 9711 of the Coal Act plus beneficiaries attributable to Westmoreland who may receive benefits from the 1992 Plan.

If the § 9712(d)(1)(B) obligation has been collapsed into the § 9712(d)(1)(A) obligation, this suggests that for the postpetition year 1997, the Trustees have a single claim for annual prefunding premiums under § 9712(d)(1)(A).

9. The calculation of withdrawal liability is similar to estimation of a claim under 11 U.S.C. § 502(c). It is not a conceptually difficult task to liquidate Coal Act obligations under §§ 9711 or 9712 to a single sum in the nature of withdrawal liability because the groups of beneficiaries are essentially fixed and the obligation does not ex-

In the context of an employer's failure to maintain an IEP under § 9711, § 9721 creates two remedies—equitable relief in the form of reinstitution of the IEP or legal relief in the form of a judgment for withdrawal liability. Section 9721, however, implicitly adds two other remedies. When a signatory operator fails to provide health benefits required by the IEP, the beneficiaries can be absorbed by the 1992 Plan. The last signatory operator is then required to reimburse the 1992 Plan on a monthly basis in accordance with § 9712(d)(1)(B). In addition, § 9712(d)(1)(C) authorizes the 1992 Plan to obtain security for payment obligations.

In the Pledge Agreement among Westmoreland, the Combined Fund and the 1992 Plan, Westmoreland pledged its shares of outstanding stock to secure obligations defined, in part, as:

(a) the obligation of Westmoreland and the Subsidiary Parties (jointly and severally) to provide security to the 1992 Plan, as set forth in Section 9712(d)(1)(C) of the Act and Article XI(4) of the 1992 Plan Trust Agreement, for the obligation of Westmoreland and the Subsidiary Parties (jointly and severally) to maintain an individual employer plan to provide for certain benefits, as set forth in § 9711 of the Act.

Among the enumerated events of default under the Pledge Agreement was the passage of the Outside Date (defined as November 29, 1996) without discharge of the Secured Obligations. Even if no other event of default was applicable, by terminating its IEP on November 26, 1996, Westmoreland defaulted under the Pledge Agreement. According to the Pledge Agreement, the Trustees are entitled to exercise remedies available "under the UCC . . . including the right to collect, receive, settle, compromise, adjust, sue for foreclosure or otherwise realize upon" the collateral at "public or private sale." These rights include the Trustees' foreclosure of the 1992 Plan's lien on the pledged shares of stock in Westmoreland's subsidiaries and the right to seek a judgment for any deficiency.

Reading the provisions of §§ 9712 and 9721 of the Coal Act, applicable provisions of ERISA and the terms of the Pledge Agreement together, the Trustees have four alternative remedies against Westmoreland for termination of its IEP. Outside of bankruptcy, the Trustees can seek equitable relief by mandatory reinstatement of Westmoreland's IEP or legal relief in the form of damages for withdrawal liability, reimbursement for payments made by the 1992 Plan to beneficiaries previously covered by Westmoreland's IEP or foreclosure of the 1992 Plan's lien against collateral pledged by Westmoreland with a subsequent claim for any deficiency.[10]

■ With regard to annual prefunding premiums, there is no dispute that Westmoreland is liable to the 1992 Plan pursuant to § 9712(d)(1)(A). At the time of the bankruptcy filing, Westmoreland's annual premium payments were current, but it has failed to pay the premium assessed postpetition for 1997. The enforcement provisions of § 9721 (i.e., § 4301 of ERISA) are applicable to this circumstance as well. For violation of this obligation, the Trustees have an equitable remedy to compel payment, a legal remedy in the form of damages for withdrawal liability and the remedies provided under the Pledge Agreement.

It is important to distinguish between the liabilities and the remedies created by the Coal Act. Congress has provided a variety of remedies to enforce two liabilities, one for health benefits to retirees covered by a coal operator's IEP and another as a contributor to the 1992 Plan's coverage of orphans. It is the liability, rather than the remedy, which gives rise to a claim in the bankruptcy process. However, the remedy selected will affect the nature of the claim asserted. For example, a claim for withdrawal liability will

---

ceed the lifetime of the beneficiaries. Indeed, the 1992 Plan estimates and projects costs for similar groups of beneficiaries on an annual basis to calculate the annual prefunding premiums. *See,* note 8, *supra.* These costs presumably are also calculated when the 1992 Plan obtains security in accordance with § 9712(d)(1)(C).

**10.** In addition, the 1992 Plan may assert Westmoreland's liability against related persons and successors in interest. 26 U.S.C. § 9711(a)(9).

result in an unsecured claim requiring estimation. Reliance on reimbursement rights under § 9712(d)(1)(B) will create a surety claim governed by 11 U.S.C. § 502(e). Assertion of a lien created in accordance with § 9712(d)(1)(C) will be a secured claim measured by the value of the collateral. Because the Trustees have not yet filed any proof of claim in this case, it is not possible to determine the type of claim which will be asserted, only whether the liability upon which it is based arose pre- or postpetition.

### B. Treatment of the Trustees' Claims in Bankruptcy

#### 1. Does collateral estoppel apply?

■ Westmoreland contends that the Trustees are collaterally estopped from asserting that Coal Act claims be given administrative priority status because similar treatment of Coal Act claims was determined adversely to the 1992 Plan in *United Mine Workers of America 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.),* 99 F.3d 573, 580–81 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1251, 137 L.Ed.2d 332 (1997). The Trustees respond that the issues resolved in *Leckie* are different than those presented here, and that there are other court decisions in conflict with *Leckie.* The Trustees favor the reasoning of the Second Circuit Court of Appeals in *LTV Steel Co. v. Shalala (In re Chateaugay Corp.),* 53 F.3d 478, 481–86 (2nd Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995).

■ The doctrine of collateral estoppel favors judicial economy by precluding litigation when:

1. An issue previously decided is identical with one presented in the present action;

2. The prior action has been finally adjudicated on its merits;

3. The party against whom the doctrine is invoked was a party or in privity with a party in the prior action;

4. The party against whom the doctrine is invoked had a full and fair opportunity to litigate the issue in the prior action.

*Robinson v. Volkswagenwerk AG,* 56 F.3d 1268, 1272–73 (10th Cir.1995), *cert. denied* —— U.S. ——, 116 S.Ct. 705, 133 L.Ed.2d 661 (1996), *citing Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980); *Orjias v. Stevenson,* 31 F.3d 995, 1010 (10th Cir.1994), *cert denied,* 513 U.S. 1000, 115 S.Ct. 511, 130 L.Ed.2d 418 (1994). Collateral estoppel is applicable to issues of both law and fact, as well as to issues which mix law and fact. *See, e.g., U.S. v. Stauffer Chemical Co.,* 464 U.S. 165, 170–71, 104 S.Ct. 575, 578–79, 78 L.Ed.2d 388 (1984); *In re CIS Corp.,* 142 B.R. 640, 641–42 (S.D.N.Y.1992) (whether a claim is entitled to administrative priority treatment is a question which mixes law and fact). For collateral estoppel to apply to an issue involving both law and fact, both the legal and factual issues presented in the prior proceeding must be identical to those presented in the current one.

Since enactment of the Coal Act in 1992, a number of courts have addressed the treatment of various Coal Act claims in bankruptcy. *See, In re Leckie, supra; In re Chateaugay, supra; In re Lady H Coal Co.,* 199 B.R. 595 (S.D.W.Va.1996), *aff'd sub nom, In re Leckie Smokeless Coal Co., supra; Adventure Resources, Inc. v. Holland,* 193 B.R. 787 (S.D.W.Va.1996); *In re Sunnyside Coal Co.,* Chapter 7, Case No. 94–12794 CEM (Bankr. D.Colo. Oct. 11, 1996), *rev'd sub nom, United Mine Workers of America 1992 Benefit Plan v. Rushton,* No. 96–M–2471 (D.Colo. July 17, 1997). Each of these cases is factually distinguishable from this proceeding.

In the instant proceeding, the enactment of the Coal Act, the Debtor's pledge of collateral to secure its Coal Act obligations, the termination of the Debtor's IEP, an action by the Trustees to enforce the Coal Act, and the 1992 Plan's coverage of the beneficiaries of the Debtor's IEP all occurred prepetition. No previous decision addresses this scenario. In *Chateaugay,* the Coal Act was enacted some six years after the bankruptcy filing. This led the Second Circuit to the logical conclusion that Coal Act obligations arose postpetition. Because Coal Act obligations were statutorily imposed, the court concluded

**12**

they were entitled to administrative expense priority as taxes under § 503(b)(1)(B).[11]

*Leckie* was a consolidated appeal in which the Fourth Circuit affirmed two district court orders in separate bankruptcies authorizing coal operators to sell assets free and clear of Coal Act claims and interests pursuant to 11 U.S.C. § 363(f). Although it is not clear from the appellate decision, the district court opinions indicate that the coal operators in both cases ceased making Coal Act payments postpetition.[12] Whether the liabilities were IEP obligations or prefunding obligations is not clear. The Fourth Circuit held that Coal Act liabilities are claims within the meaning of 11 U.S.C. § 101(5), but expressly did not determine what, if any, Coal Act liability the purchaser of the assets would acquire as a "successor in interest."[13]

I do not find *Leckie* to be dispositive for two reasons. First, only imposition of the liability occurred prepetition. The obligation apparently was not secured prepetition and

the breach of the debtor's IEP as well as the 1992 Plan's coverage of IEP beneficiaries occurred postpetition. Second, the question of the priority of Coal Act claims was not resolved. Although the Fourth Circuit concluded that Coal Act obligations fell within the bankruptcy definition of a claim and characterized future premium obligations under § 9712 as unmatured and contingent rights, the court did not determine whether such claims should be granted administrative expense status under either § 503 or § 1114 of the Bankruptcy Code.

*Sunnyside* involved priority of claims in a Chapter 7 case arising from a debtor's postpetition failure to pay annual prefunding premiums pursuant to § 9712(d)(1)(A) and monthly per beneficiary reimbursement premiums under § 9712(d)(1)(B). Sunnyside discontinued its coal operations before filing its petition under Chapter 11. After the bankruptcy filing, it sought authority to stop payments to retirees under § 1114 of the Bankruptcy Code, which request was denied.

---

**11.** *Chateaugay* is cited by the Trustees and several courts for its ruling that Coal Act obligations are taxes. But due to the peculiar circumstances in *Chateaugay,* such conclusion may have been as much a product of pragmatism as it was the result of careful legal analysis. In *Chateaugay,* the debtor, LTV, claimed that its Coal Act obligations were prepetition debts that were subject to disallowance because no timely proof of claim was filed. The Second Circuit held that because the Coal Act was enacted after LTV's bankruptcy filing, the Coal Act obligations were postpetition claims. Postpetition claims are payable by a Chapter 11 debtor either in the ordinary course *or* as administrative expenses, but LTV's Coal Act obligations were not paid in the ordinary course. The Second Circuit ruled that the obligations were taxes in accordance with *City of New York v. Feiring,* 313 U.S. 283, 285, 61 S.Ct. 1028, 1029, 85 L.Ed. 1333 (1941) and *In re Lorber Indus. of California, Inc.,* 675 F.2d 1062, 1066 (9th Cir.1982). It also based its conclusion on the factual finding by the district court that the obligations were in the "nature of a tax." Practically speaking, this was the only result that permitted LTV's payment of Coal Act obligations. Several courts have since adopted *Chateaugay,'s* conclusion without further analysis. As a result there is now a chain of precedent without consideration of whether Coal Act obligations are actually taxes for purposes of § 503(b)(1)(B)(i) or simply obligations "in the nature of a tax."

**12.** *UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co.,* 201 B.R. 163 (S.D.W.Va.1996); *In re Lady H Coal Co.,* 199 B.R. 595 (S.D.W.Va.1996).

**13.** *Leckie's* restricted holding creates substantial uncertainty as to whether Coal Act liabilities are prepetition claims comprehensively dealt with in the bankruptcy process. On one hand, the court held that Coal Act obligations are unmatured, contingent claims as defined by § 101(5) of the Bankruptcy Code. It further held that because § 363(f) of the Code authorizes sales of assets "free of claims and interests," the debtor was entitled to liquidate its assets without immediate payment of Coal Act liabilities. This suggests that Coal Act claims, like other prepetition claims, are assertable only against the proceeds of a debtor's assets.

On the other hand, the court declined to determine whether the purchaser of the debtor's assets would have successor liability under the Coal Act. Generally, when a sale of assets is authorized under § 363(f), claims and interests attach to the proceeds of the sale; the purchaser receives title to the assets "free and clear" of such liabilities. Clear title to property is the objective of most purchasers. By declining to determine whether the purchaser would be a "successor-in-interest" for Coal Act obligations, the court left open the possibility of a purchaser's liability for prepetition claims. If a purchaser buys a debtor's prepetition liability under the Coal Act along with the assets, then the "free and clear" provision of § 363(f) becomes meaningless. Furthermore, it is unclear how and to what extent distribution from a bankruptcy estate would satisfy an unmatured, contingent claim which continues against the purchaser.

It thereafter terminated its IEP and its Chapter 11 case was converted to a case under Chapter 7. Apparently, the 1992 Plan then absorbed the IEP beneficiaries into the orphan plan and assessed prefunding premiums against the estate pursuant to § 9712(d)(1)(A). The 1992 Plan asserted that such claim was entitled to administrative priority as a postpetition tax under § 503(b)(2)(B). Two issues were addressed in *Sunnyside:* (1) whether postpetition premiums were taxes entitled to priority as an administrative expense, and (2) whether the obligation to pay premiums is capped in a Chapter 7 case. The bankruptcy court held that the 1992 Plan's postpetition claims for premiums due under § 9712(d)(1)(A) and (B) were not taxes and therefore not entitled to treatment as administrative expenses. It then summarily dismissed the 1992 Plan's contention that the Chapter 7 estate must continue to pay premiums so long as Sunnyside retirees received benefits as "untenable, unacceptable and contrary to the concept of a claim." The district court disagreed and reversed, adopting the *Chateaugay* conclusion that Coal Act obligations are taxes, but the district court agreed with the bankruptcy court that the estate need not remain open until the 1992 Plan had consumed all of the estate's assets or until all of the beneficiaries die. Instead, the district court held that at "some time after the disposition of the physical assets remaining in the estate and before submission of the Trustee's final report, the tax liability will cease to accrue and the estate may be prepared for closing." Sunnyside is factually distinguishable from the case at bar for the same reason as *Leckie.*

The case most similar to the case at bar is *Adventure Resources, Inc. v. Holland, supra.* In *Adventure Resources,* the court considered whether the monthly per beneficiary premiums owed under § 9712(d)(1)(B) and monthly contributions owed under the NBCWA were entitled to administrative priority under §§ 503 or 1114. Adventure Resources filed its bankruptcy petition after enactment of the Coal Act. Unlike Westmoreland but like Sunnyside and Leckie, Adventure Resources discontinued its IEP postpetition, causing § 9712(d)(1)(B) obligations to arise. Adopting the *Chateaugay*

conclusion that such obligations are taxes, the bankruptcy court concluded that the § 9712(d)(1)(B) claims were entitled to administrative expense priority under § 503(b)(1)(B). However with regard to the NBCWA obligations, its conclusion was different. The NBCWA obligations were incurred prepetition and, therefore, were ineligible for administrative expense priority under § 503. In exploring whether the NBCWA claims were entitled to administrative expense priority as employee benefits pursuant to § 1114(e), the court carefully considered the legislative history behind § 1114 and concluded that there was no congressional directive which accorded priority status to the NBCWA prepetition retiree benefit claims.

None of these decisions involved a prepetition pledge to secure Coal Act obligations, pre-bankruptcy termination of the debtor's IEP or prepetition absorption of IEP beneficiaries by the 1992 Plan. None involved a request by the 1992 Plan to require reinstatement of the debtor's IEP. Moreover, none of the cases distinguished between the 1992 Plan's remedy of monthly reimbursement of benefits for beneficiaries previously covered by the debtor's IEP under § 9712(d)(1)(B) and prefunding premium liability under § 9712(d)(1)(A). Thus, while the analysis in these opinions is helpful, the doctrine of collateral estoppel is not applicable.

### 2. Does the 1992 Plan hold pre- or postpetition claims against Westmoreland?

The Trustees argue that Westmoreland's IEP obligation and annual prefunding premium obligation create postpetition claims entitled to § 503 priority status. They assert that the claims arise postpetition because the obligation to pay is created upon assessment of the premiums. Westmoreland responds that although premiums may be assessed postpetition, the Trustees hold prepetition claims which are not entitled to administrative expense priority. Westmoreland further argues that it cannot be compelled to reinstate its IEP because to do so would, in effect, elevate a prepetition claim into a postpetition administrative expense and violate the automatic stay.

A "claim" for bankruptcy purposes is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured...." 11 U.S.C. § 101(5)(A). As noted in *Chateaugay*, "Congress unquestionably expected this definition to have wide scope ... [and intended] to invest the term 'claim' with the 'broadest possible scope' so that all legal obligations of the debtor ... will be able to be dealt with in a bankruptcy case." 53 F.3d at 496–97 (quoting *In re Chateaugay Corp.*, 944 F.2d at 1003 and *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 557, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990)).[14] A claim also includes the right to an equitable remedy for breach of performance, but only if the breach gives rise to a right to payment. 11 U.S.C. § 101(5)(B). A claim arises prepetition if the relationship between the debtor and the creditor contains all the elements necessary to give rise to a legal obligation—"a right to payment" under nonbankruptcy law. *In re National Gypsum Co.*, 139 B.R. 397, 405 (N.D.Tex.1992). A claim does not become a postpetition claim simply because payment is due postpetition. *Stewart Foods v. Broecker (In re Stewart Foods)*, 64 F.3d 141, 146 (4th Cir.1995).

The decisions of courts that have addressed bankruptcy treatment of Coal Act obligations uniformly conclude that Coal Act obligations create claims to be administered in the bankruptcy process. The more difficult question is whether such claims arise prepetition or postpetition.

In *Chateaugay*, the Fourth Circuit determined that the Coal Act obligations were postpetition obligations because the Coal Act was not enacted until six years after the debtor filed its petition for bankruptcy relief and "where the statute imposing the liability has not been enacted it would be impossible to find even the remotest [prepetition] right to payment." *Chateaugay*, 53 F.3d at 497. In *Leckie*, the Fourth Circuit ruled that a debtor's liability for Coal Act premiums is not determined by the time when the premiums are assessed, but rather by the acts which created the obligations. The fact that premium payments would be assessed after the bankruptcy filing merely made the prepetition claim unmatured, unliquidated, and contingent. *Leckie*, 99 F.3d at 580–81. Applying the same reasoning, the bankruptcy court in *Adventure Resources* concluded that the monthly contributions owed under NBCWA arose prepetition because the agreements became effective and the obligation was imposed before the bankruptcy filing, but the monthly per beneficiary premiums owed under § 9712(d)(1)(B) were postpetition claims because they arose from the debtor's postpetition discontinuance of its IEP.[15]

The reasoning of the courts in *Chateaugay*, *Leckie* and *Adventure Resources* is conceptually consistent. When all of the events which give rise to a liability occur prepetition, the resulting claim is a prepetition claim. Conversely, where all of the events which give rise to the obligation occur postpetition, the claim is a postpetition claim.[16]

---

14. Our Tenth Circuit Court of Appeals has similarly construed "claim" in sweeping fashion. *Gill v. Winn (In re Perma Pacific Properties)*, 983 F.2d 964, 968 (10th Cir.1992).

15. Though not addressed in *Sunnyside*, both the bankruptcy court and district court assumed that the § 9712 claim arose postpetition.

16. The difficult situation is where some triggering events occur prepetition and some postpetition. I have not found a bright-line test enunciated by the Tenth Circuit with regard to such situations. Indeed, on two occasions the Tenth Circuit has declined to choose between the reasoning in *Matter of M. Frenville Co.*, 744 F.2d 332 (3rd Cir.1984), and the approaches taken in other circuits. *See, Franklin Savings Ass'n v. Office*

of Thrift Supervision, 31 F.3d 1020, 1021 (10th Cir.1994), and *In re Grynberg*, 966 F.2d 570 (10th Cir.1992). This has not, however, precluded the Tenth Circuit from concluding that an unmatured payment obligation constitutes a prepetition claim if the cause of action creating the claim arose prepetition. For example, in *Franklin, supra*, a bill of costs stemming from litigation for which appeals ceased postpetition was recognized as a prepetition claim. Similarly, in *Isaac v. Temex Energy, Inc. (In re Amarex, Inc.)*, 853 F.2d 1526 (10th Cir.1988), the court recognized that what is crucial in determining priority status is the consideration supporting the claim and whether the consideration was prepetition. "It makes no difference that the duty to indemnify [claimant] for litigation expenses, if such duty exists, did not accrue until after the petition was

■ As noted earlier, at the time of its bankruptcy filing Westmoreland had two types of liability under the Coal Act. Under § 9711, Westmoreland was obligated to pay for future health benefits for its retirees and their families covered by its IEP. Until the termination of this IEP, this duty was owed directly to the beneficiaries. The 1992 Plan acted as an insurer. Upon termination of the IEP and absorption of the IEP beneficiaries by the 1992 Plan in accordance with § 9712(b), Westmoreland became liable to the Trustees rather than to the beneficiaries. The Trustees therefore have an unliquidated, unmatured claim for reimbursement of future health benefits to be paid to IEP beneficiaries. What form this claim takes depends upon the remedy the Trustees select.

■ All of the events triggering Westmoreland's liability to the Trustees occurred prepetition. Westmoreland's original obligation to the beneficiaries of its IEP was created prepetition. Indeed, the retirees who benefitted from the IEP all retired prior to September 30, 1994. Westmoreland's liability to the Trustees also arose prepetition. The fact that Westmoreland secured such obligation by pledging its stock prepetition suggests that its obligation to the Trustees' arose upon the effective date of the Coal Act. However, the Trustees right to payment as surety certainly arose prepetition upon termination of Westmoreland's IEP and the 1992 Plan's coverage of the beneficiaries previously covered by the IEP. Had the Trustees no prepetition claim against Westmoreland, there would have been no basis for their prepetition lawsuit.

The same conclusion is applicable to the Trustees' claim for annual prefunding premiums for future health benefits for orphaned retirees and their families. Westmoreland's obligation as a last signatory operator under § 9712(d)(1)(A) arose at the time of the enactment of the Coal Act. Such obligation was secured prepetition and Westmoreland paid premiums assessed prepetition. Although the amount of future premiums to be assessed may vary due to the number of orphaned beneficiaries or the number of coal operators contributing, Westmoreland's obligation to pay and the Trustees' right to be paid does not change. For future prefunding premiums the Trustees hold an unmatured, unliquidated claim which will be quantified and paid in the bankruptcy process.

■ This conclusion is consistent with the treatment of ERISA withdrawal liability. ERISA withdrawal liability is a prepetition claim if the liability is triggered prepetition, even if assessment occurs postpetition. *PBGC v. Reorganized CF & I Fabricators of Utah, Inc. (In re CF & I Fabricators of Utah, Inc.)*, 179 B.R. 704, 708 (D.Utah 1994), *aff'd in part and rev'd in part on other grounds*, —— U.S. ——, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996); *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 103 (2nd Cir.1986); *In re CD Realty*, 205 B.R. 651 (Bankr.D.Mass.1997); *In re Finley, et al.*, 160 B.R. 882, 892 (Bankr.S.D.N.Y. 1993); *In re Pulaski Highway Express, Inc.*, 57 B.R. 502, 507 (Bankr.M.D.Tenn.1986).[17]

Characterization of the Trustees' claims as prepetition debt is also consistent with treat-

---

filed ... the critical fact is that the claim for indemnity arose from prepetition services [claimant] provided the corporation," *quoting Christian Life Center Litigation Defense Comm. v. Silva (In re Christian Life Center)*, 821 F.2d 1370, 1374 (9th Cir.1987). Judge Brumbaugh of this Court acknowledged the same concept in *In re Brent Explorations, Inc.*, 91 B.R. 104 (Bankr.D.Colo. 1988), when he declined to give administrative priority status to taxes on prepetition oil production notwithstanding that the taxes were assessed postpetition.

17. This is also consistent with treatment of claims for other employee benefits. In general, courts treat most employee benefit claims accrued as a result of prepetition labor as prepetition unsecured claims. These include claims for

wages, salaries or commissions, vacation pay, severance and worker's compensation payments, medical, life and disability insurance and pension benefits. *See, e.g., PBGC v. Reorganized CF & I Fabricators of Utah, Inc., supra* (the transaction giving rise to the debtor's liability for contributions was the prepetition labor of the debtor's employees); *PBGC v. LTV Corp.*, 875 F.2d 1008, 1019 (2nd Cir.1989), *rev'd on other grounds*, 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (pension benefits); *Matter of Health Maintenance Foundation*, 680 F.2d 619, 621 (9th Cir.1982) (severance pay); *In re Nat'l Bickford Foremost, Inc.*, 116 B.R. 351, 352 (Bankr.D.R.I.1990) (medical benefits); *In re U.S. Truck Co.*, 42 B.R. 790 (Bankr.E.D.Mich.1984) (disability benefits); *In re Columbia Packing Co.*, 34 B.R. 403 (Bankr. D.Mass.1983) (workers' compensation).

ment of other bankruptcy claims. The Trustees' claims are similar to long term debt evidenced by a promissory note with a floating interest rate. The obligation arises when the promissory note is signed. The debtor breaches by failing to make the required payments and then files for bankruptcy protection. The fact that payments are due postpetition and that the amount of the debt as well as future payments may be affected by postpetition changes in prevailing interest rates does not entitle the resulting claim to postpetition status.

### 3. Can the Trustees compel Westmoreland to reinstate its IEP while Westmoreland is in bankruptcy?

The Trustees argue that because § 9711 requires Westmoreland to maintain its IEP, Westmoreland should be compelled to do so postpetition. I do not agree. First, it is not clear that the Trustees could compel reinstatement of Westmoreland's IEP under non-bankruptcy law. Generally, an equitable remedy is available only when the remedy at law, typically damages, is inadequate. *Bugher v. Feightner*, 722 F.2d 1356 (7th Cir.1983), *cert. denied*, 469 U.S. 822, 105 S.Ct. 98, 83 L.Ed.2d 43 (1984). This principle is apparent in the ruling of the United States District Court for the Western District of Virginia in which the court declined to order reinstatement of the IEP even on a temporary basis. Instead it ordered Westmoreland to pay $200,000 per week and restructure its activities for the express purpose of preserving its ability to satisfy any judgment ultimately entered.

Second, the Trustees confuse their remedies under the Coal Act with their claims in bankruptcy. Compelling Westmoreland to reinstate its IEP is only one of four non-bankruptcy remedies available to enforce § 9711. However, a claim for bankruptcy purposes is limited to a right to payment. 11 U.S.C. § 101(5). When a creditor has both an equitable remedy to enforce or prohibit action as well as a right to payment, it is the right to payment which constitutes the claim to be administered in bankruptcy. *Johnson v. Home State Bank*, 501 U.S. 78, 83–84, 111 S.Ct. 2150, 2153–54, 115 L.Ed.2d 66 (1991). The bankruptcy process adminis-

ters only claims which can be reduced to monetary amounts. *In re Chateaugay Corp.*, 944 F.2d 997, 1007 (2nd Cir.1991) (mandatory injunction under CERCLA is converted to monetary claim to be administered in bankruptcy). Indeed, § 502(c)(2) provides for monetary estimation of an equitable claim.

Reinstatement of Westmoreland's IEP would distort the priority scheme for payment of monetary claims. The Code is premised on the theme of equality of distribution. Any preferential treatment of a claim not intended by Congress to have priority distorts the intended priority scheme. *In re Jartran*, 732 F.2d 584, 586 (7th Cir. 1984), *citing In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir.1976). Compelling the debtor's postpetition reinstatement of its IEP would result in more favorable treatment of the Trustees' claim than that received by other prepetition claimants. *See, e.g., Employee Transfer Corp. v. Grigsby (In re White Motor Corp.)*, 831 F.2d 106, 111–12 (6th Cir.1987) ("[u]nder no circumstances can the debtor's authority to operate its business ... be interpreted or extended to permit the transformation of prepetition debt to an administrative expense"); *Dade County School Dist. v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 53 B.R. 346, 354 (Bankr. S.D.N.Y.1985). ("So long as the relief sought by the school claimant comports with the court's definition of 'claim,' the mere label of 'adversary proceeding' or the request for injunctive relief does not alter the fact that the school claimants are precluded from recovering from the Manville estate outside the proof of claim process.") Requiring postpetition reinstatement of Westmoreland's IEP would be tantamount to treating Westmoreland's obligation as a postpetition claim, which it is not.

Finally, civil enforcement of prepetition claims by non-governmental creditors is prohibited by operation of the automatic stay. 11 U.S.C. § 362. Although §§ 362(b)(4) and (b)(5) specifically exempt a governmental unit's actions to enforce police or regulatory power from the automatic stay, these provisions are inapplicable because the 1992 Plan does not qualify as a governmental

unit.[18]  The Trustees are therefore stayed from seeking to enforce a prepetition obligation.

### 4.  Are the Trustees' claims entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(1)(A) or (B)?

The Trustees argue that the payments assessed under §§ 9712(d)(1)(A) and (B) qualify as administrative expense claims because they are either actual, necessary costs and expenses of preserving the estate (§ 503(b)(1)(A)) or taxes incurred by the estate (§ 503(b)(1)(B)).

Administrative expense priority under § 503(b)(1)(A) is reserved for obligations incurred during the course of the bankruptcy case which arise from the postpetition operation of a debtor's business or administration of the bankruptcy case.  This subsection only applies to a claim which is an "actual, necessary cost and expense of preserving the estate."  Since the bankruptcy estate is created only upon filing, a cost or expense of preserving it can arise only postpetition.

An expense is administrative only if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor-in-possession (citations omitted) and "only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business."  A debt is not entitled to priority simply because the right to payment arises after the debtor-in-possession has begun managing the estate.

*Isaac v. Temex Energy, Inc. (In re Amarex)*, 853 F.2d 1526, 1530 (10th Cir.1988), *quoting Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2nd Cir. 1986); *see also, General American Transp. Corp. v. Martin (In re Mid Region Petrole-*

*um, Inc.)*, 1 F.3d 1130, 1132–33 (10th Cir. 1993).

Section 503(b)(1)(B) contains a similar restriction.  It accords administrative priority to taxes "incurred by the estate."  A tax claim is incurred when the event that triggers liability first occurs, not when the liability is assessed or becomes payable.  *Midland Central Appraisal Dist. v. Midland Indus. Serv. Corp. (In re Midland Indus. Serv. Corp.)*, 35 F.3d 164, 166–67 (5th Cir. 1994), *cert. denied*, 514 U.S. 1016, 115 S.Ct. 1359, 131 L.Ed.2d 216 (1995); *In re Western States Distribs., Inc.*, 179 B.R. 666, 668 (Bankr.D.Colo.1995); *Adventure Resources, supra* at 795.  Thus, this priority is available only for taxes which arise after the bankruptcy filing and are owed by the estate, as distinguished from taxes owed prepetition by the debtor.

Because the Trustees' claims arose prepetition, they are not entitled to administrative expense priority under either §§ 503(b)(1)(A) or (B).  It is therefore unnecessary to classify these claims as either an expense of estate administration or as a tax.

### 5.  Are the Trustees entitled to administrative expense priority pursuant to 11 U.S.C. § 1114(e)?

At the outset of this proceeding both Westmoreland and the Trustees disclaimed that § 1114 applied.  In their Reply, however, the Trustees assert that the Court should "follow Judge Matheson's ruling in *Sunnyside* and hold that Westmoreland cannot modify its Coal Act obligations and that Westmoreland must pay those obligations as administrative expenses under § 1114."  Presumably the Trustees rely on § 1114(e)(2) which provides that retiree benefits defined in § 1114 are entitled to administrative expense priority.[19]

---

18.  The court in *Adventure Resources, Inc. v. Holland, supra,* at 795 n. 15, reached the same conclusion when determining whether Coal Act obligations might be treated as priority taxes under § 507(a)(8)(A).  A governmental unit is defined in 11 U.S.C. § 101(27) as:

United States; State; Commonwealth; District, Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee

while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

The 1992 Plan does not fall within this definition; it is instead defined as a "separate, private plan" according to 28 U.S.C. § 9712(1).

19.  11 U.S.C. § 1114(e)(2).

Any payment for retiree benefits required to be made before a plan confirmed under section

Section 1114 of the Bankruptcy Code requires that a debtor pay health benefits to its retired employees during a Chapter 11 case. Section 1114 was enacted in 1988 in response to the termination of health and insurance benefits of approximately 78,000 retirees by LTV Corporation while in Chapter 11. It is clear that § 1114 was designed to prevent interruption in payment of retiree benefits during a Chapter 11 bankruptcy case, but to allow a debtor to modify its payments due to economic necessity. The section creates a procedure for a debtor to negotiate a requested modification with a designated representative of the beneficiaries and to seek court approval of a modification if no agreement is reached. Its provision that retiree payments be treated as administrative expenses dovetails with § 1129(a)(13) which requires continuation of retiree benefits as a condition of confirmation of a Chapter 11 plan.

This Court is not presented with an issue of modification of retiree benefits as was the court in *Sunnyside*. Instead, the issue is whether § 1114 applies to the Trustees' prepetition claims. If it does, notwithstanding their prepetition nature, such claims must be accorded an administrative expense priority. If not, the claims are simply prepetition claims.

Section 1114(a) defines "retiree benefits":

For purposes of this section, the term "retiree benefits" means payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title.

Summarized, the retiree benefits governed by § 1114 are payments or reimbursements for medical and health benefits "under a plan, program or fund" which was "maintained or established in whole or in part" by the debtor before the bankruptcy.

■ In determining the scope of a statute, a court must begin with the statutory language itself. When the terms of the statute are clear, the statutory language is controlling, absent exceptional circumstances. *Fidelity Savings & Inv. Co. v. New Hope Baptist*, 880 F.2d 1172, 1175 (10th Cir.1989). Where a statute contains no definition of a term in question, the general rule is that the word be interpreted in its ordinary, everyday sense. *United States v. Mayberry*, 774 F.2d 1018, 1020 (10th Cir.1985). If the language is unambiguous, it should be applied as written without further resort to legislative history. *Central Trust Co. v. Official Creditors' Committee of Geiger Enterprises, Inc.*, 454 U.S. 354, 359, 102 S.Ct. 695, 697–98, 70 L.Ed.2d 542 (1982). However, if statutory language is ambiguous, resort to its legislative history is appropriate so that the statute can be interpreted to effect its evident purpose. *Rocky Mt. Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 745 (10th Cir.1982). Although the bankruptcy law is remedial legislation and, therefore can be liberally construed (*Israel–British Bank (London) Ltd. v. FDIC*, 536 F.2d 509, 513 (2nd Cir.1976)), federal courts should not act to fill the "interstices in the law inadvertently left by legislative enactment." *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 108, 108 S.Ct. 404, 412, 98 L.Ed.2d 415 (1987). This is especially true with regard to a provision creating priority which must be construed narrowly. *In re Amarex*, 853 F.2d at 1530.

The first portion of the definition appears to apply in this circumstance. Under the Coal Act, Westmoreland pays for medical or health benefits for its retirees, directly under its own IEP or indirectly by payment to the 1992 Plan. However, the requirement that plans, funds or programs must have been "maintained or established in whole or in part by the debtor" prior to bankruptcy is problematical.

1129 of this title is effective has the status of an allowed administrative expense as provided in

section 503 of this title.

The phrase "maintained or established" is not defined elsewhere in the Code. The plain meaning of "establish" is to "institute" or "bring into existence." WEBSTER'S NEW COLLEGIATE DICTIONARY 687 (1979). To "maintain" is to "keep in its existing state" or "preserve from failure or decline" or "support or provide for." WEBSTER'S NEW COLLEGIATE DICTIONARY 388 (1979). Read in the alternative but in the context of the phrase "prior to filing a petition," it appears that the plans, funds or programs described are those which were "established" or "supported" prepetition by the debtor. The modifying phrase "in whole or in part" suggests that the covered funds or plans would include those with multiple contributors. What is not clear from the definition is whether Congress intended it to apply only to plans voluntarily created by a debtor or also to statutorily-created plans such as the 1992 Plan. It is also unclear whether Congress intended § 1114 to apply to plans which were terminated prepetition.

The remaining language of § 1114 suggests that Congress intended this provision only to apply to plans voluntarily created by a debtor which are in operation at the time of the bankruptcy filing. The elaborate procedure for selecting a representative of the beneficiaries and for negotiation of modifications proposed by a debtor indicates that Congress was concerned with collectively bargained-for agreements rather than obligations fixed by statute. If § 1114 were to apply to statutory obligations owed to entities created by statute, the provisions for determining the representative of the beneficiaries and for negotiated modification would be rendered meaningless. Furthermore, there is no provision for negotiation with or representation of beneficiaries when their benefits are paid by an insurer such as the 1992 Plan after termination. If an insurer pays benefits there is no need to compel a debtor to do so. The insurer is entitled to file a claim under § 509, to be allowed or disallowed in accordance with 11 U.S.C. § 502(e).

I find nothing in the legislative history[20] indicating that Congress intended § 1114 to apply to statutorily-imposed obligations or to benefits paid by an insurer following prepetition termination of a debtor's self-funded plan. In the absence of a clear directive that Congress intended § 1114 to apply to the circumstances presented here, I cannot conclude that the Trustees' claims are entitled to administrative expense priority under § 1114(e)(2).

Unfortunately, this strict interpretation of the language of § 1114 rewards Westmoreland for its prepetition breach of its duty to maintain its IEP under § 9711. Had Westmoreland maintained its IEP as required, it would have been compelled to continue making retiree benefit payments during the course of its Chapter 11 case. Such payments would have been administrative expenses under § 1114 or § 503. By terminating its IEP prepetition, Westmoreland ensured that its Coal Act obligations would be prepetition claims and removed itself from the scope of § 1114.

To my eye, this result is legally correct but socially repugnant. It is unjust in popular parlance because it rewards Westmoreland's breach of its statutory obligations. Successful evasion of § 9711 may well encourage other coal operators to shed Coal Act obligations in a similar manner.

This situation is illustrative of a dilemma facing courts on an ever more frequent basis. To be sure, justice, like beauty, is in the eye of the beholder. But the public trusts that the application of the law will yield a result that, to most people in most instances appears just. Trained in the common law, judges hope to do justice in every case before them.

Application of common law, which is both imprecise and flexible, aids this purpose because is expands incrementally on a case-by-case basis, under the discretion and guidance

---

20. *See:* DONALD R. KOROBKIN, EMPLOYEE INTERESTS IN BANKRUPTCY, 4 Am. Bankr.Inst. L.Rev. 5 (1996); JACK L. SMITH, DANGEROUS SHIELD? RETIREE BENEFITS: ROADBLOCK TO REORGANIZATION, 13 No. 1 Bankr.Strategist 4 (1995); KAREN E. WAGNER, EMPLOYEE BENEFIT CLAIMS IN BANKRUPTCY, C887 ALI–ABA 255 (1994); SUSAN J. STABILE, PROTECTING MEDICAL BENEFITS IN BANKRUPTCY: THE SCOPE OF SECTION 1114 OF THE BANKRUPTCY CODE, 14 Cardozo L.Rev. 1911 (1993).

of the judiciary. Reasoning from case precedent, lawyers and judges can extrapolate and modify the common law to do justice in individual controversies.

In contrast, statutory law is more restrictive, precise and inflexible. Enacted through the democratic process, it is reactive to problems recognized or anticipated by the electorate and its representatives. Statutory law is intended to reflect the consensus of its drafters, but semantic imprecision and grammatical construction often change the interpretation and application of the law from what its drafters envisioned. Further counterbalancing its intended precision is the fact that statutory law is always playing catch-up because neither the electorate nor legislators can fully anticipate the creative machinations of those who seek to avoid compliance.

In situations such as the one at bar, the failure of the applicable statutory law to address the circumstances presented is particularly frustrating. When the language of a statute does not give a court discretion to do justice in a given controversy, the court is faced with a painful dilemma. The judge may apply the law as written, mirroring its imperfections and decrying the result, or the judge may interpret the law in the manner necessary to render what he or she believes is a just result. In making interpretations, judges look to legislative intent, ambiguity within the statute, and equitable powers. However, such interpretation necessarily is infused with the judge's personal predilections and can result in a bending, molding or reshaping of statutory law in a manner inconsistent with the intent of its drafters.

Both routes have their risks. Failure to apply statutory law as written with all of its warts and blemishes impugns the democratic process by which the law was enacted. It substitutes the judge's perception of justice for that of the populace. It leads to friction between the legislative and judicial branches of government and to claims of judicial arrogance. As to future application of the same statute, judicial interpretation may unduly broaden or narrow the law.[21] However, literal application of inadequate, imperfect statutory law is also risky. When application of statutory law does not do justice to the popular eye, the law is viewed as a collection of meaningless technicalities. Such a view inspires little respect for or compliance with the law. Legal technicalities instead encourage people to treat the law as a game in which the winner finds the loophole that excuses compliance. At either extreme, the population grows distrustful of its judicial and legislative institutions.

Reconciliation of common law principles with a mushrooming body of statutory law, especially federal law, comes at a significant price to society. There is increasing confusion as to the law's meaning and application. Out of this grows ever escalating litigation accompanied by decreasing popular confidence in the law and judicial processes. Each judge in each case must make a choice as to which alternative carries the greater risk.

Under the circumstances presented here, I am compelled to apply § 1114 narrowly, as written. I do so with the fervent hope that if Congress intends employers to pay or reimburse retiree health benefits during the course of a Chapter 11 case, no matter the circumstances, it will take such action as necessary to clarify its intent.

## V. ORDER

**IT IS THEREFORE ORDERED** that summary judgment shall enter on all claims asserted by the Trustees against Westmoreland. In particular:

1. The claims of the Trustees of the 1992 Benefit Plan against Westmoreland arising under 26 U.S.C. § 9711 and § 9712 are prepetition debts not entitled to administrative priority status under 11 U.S.C. §§ 503(b)(1)(A), (B) or 11 U.S.C. § 1114; and

2. The request of the Trustees of the 1992 Benefit Plan to compel reinstatement of Westmoreland's Individual

---

**21.** One example is the chain of precedent based upon the *Chateaugay* conclusion that Coal Act obligations are taxes. *See* note 11, *supra*.

Employer Plan during this bankruptcy case is **DENIED**.